12-4218-cv (L)
Merck Eprova AG v. Gnosis S.p.A., Gnosis Bioresearch S.A.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2013

(Argued: November 15, 2013                    Decided: July 29, 2014)

Docket Nos. 12-4218-cv(L), 13-513-cv(Con)

_____

MERCK EPROVA AG,

*Plaintiff-Appellee,*

v.

GNOSIS S.P.A., GNOSIS BIORESEARCH S.A.,

*Defendants-Appellants.*

_____

Before: POOLER, RAGGI, and WESLEY, *Circuit Judges.*

Consolidated appeal from a judgment of the United States District Court

for the Southern District of New York (Richard J. Sullivan, *J.*) entered following a

September 30, 2012 Opinion After Bench Trial, *Merck Eprova AG v. Gnosis S.p.A.*,

901 F. Supp. 2d 436 (S.D.N.Y. 2012), and a January 31, 2013 Memorandum and

Order, *Merck Eprova AG v. Gnosis S.p.A.*, No. 07 Civ. 5898(RJS), 2013 WL 364213 (S.D.N.Y. Jan. 31, 2013). The district court found in favor of Plaintiff-Appellee Merck Eprova AG on its Lanham Act false advertising and contributory false advertising claims, and awarded Merck $526,994.13 in damages, over $2 million in attorneys' fees and costs, and prejudgment interest from March 2006 until September 30, 2012, and ordered that defendants engage in a corrective advertising campaign.

This appeal requires our Court to clarify certain aspects of our false advertising jurisprudence. We conclude that where, as here, the parties operate in the context of a two-player market and literal falsity and deliberate deception has been proved, it is appropriate to utilize legal presumptions of consumer confusion and injury for the purposes of finding liability in a false advertising case brought under the Lanham Act. We further hold that in a case where willful deception is proved, a presumption of injury may be used to award a plaintiff damages in the form of defendant's profits, and may, in circumstances such as those present here, warrant enhanced damages.

Affirmed.

_____

LAURIE A. HAYNIE, Husch Blackwell LLP, Chicago, IL (JOSEPH CWIK, Husch Blackwell LLP, Chicago, IL; WILLIAM D. CHAPMAN, Cadden & Fuller LLP, Irvine, CA, on the brief), *for Defendants-Appellants*.

NATALIE CLAYTON, Alston & Bird LLP, (LANCE SODERSTROM, on the brief), New York, NY, *for Plaintiff-Appellee.*

POOLER, *Circuit Judge*:

Defendants-Appellants Gnosis S.p.A. and Gnosis Bioresearch S.A. (together, "Gnosis") appeal from a September 30, 2012 Opinion After Bench Trial, *Merck Eprova AG v. Gnosis S.p.A.* (*"Merck I"*), 901 F. Supp. 2d 436 (S.D.N.Y. 2012), and a January 31, 2013 Memorandum and Order, *Merck Eprova AG v. Gnosis S.p.A.* (*"Merck II"*), No. 07 Civ. 5898(RJS), 2013 WL 364213 (S.D.N.Y. Jan. 31, 2013), of the United States District Court for the Southern District of New York (Richard J. Sullivan, *J.*), entering judgment in favor of Plaintiff-Appellee Merck Eprova AG ("Merck") on its Lanham Act false advertising and contributory false advertising claims; awarding Merck $526,994.13 in damages, over $2 million in attorneys' fees and costs, and prejudgment interest from March 2006 until September 30, 2012; and ordering that Gnosis engage in a corrective advertising campaign.

This appeal requires our Court to clarify certain aspects of our false advertising jurisprudence. We conclude that where, as here, the parties operate in the context of a two-player market and literal falsity and deliberate deception have been proved, it is appropriate to utilize legal presumptions of consumer confusion and injury for the purposes of finding liability in a false advertising case brought under the Lanham Act. We further hold that in a case where willful deception is proved, a presumption of injury may be used to award a plaintiff damages in the form of defendant's profits, and may, in circumstances such as those present here, warrant enhanced damages. For the reasons discussed below, we therefore AFFIRM the district court judgment in its entirety.

## BACKGROUND

### I. The Parties and their Products

#### A. Folate

The nutritional ingredient at issue in this litigation is a dietary ingredient called Folate, which is a B vitamin that helps the body make new cells. Folate is considered a critical supplement for prenatal health, and low folate intake is associated with various vascular, ocular, neurological and skeletal disorders, and may pose a serious risk to individuals with diabetes. While folate does not occur

4

naturally in large quantities it can be found in leafy green vegetables, whole grains, citrus fruits, and organ meats. Tetrahydrofolates are the predominant naturally occurring forms of folate, and in particular, the tetrahydrofolate 5-methyltetrahydrofolic acid (abbreviated as "5-MTHF") is one of the predominant naturally occurring folate forms.

Stereochemistry is a branch of chemistry that studies the particular arrangement of atoms that form the structures of molecules. *See Merck I*, 901 F. Supp. 2d at 444. Chemical compounds that have the same composition but differ in the chemical arrangement of their constituents are called isomers, and if chemical compounds differ *only* in their spatial arrangement around a carbon atom, they are called stereoisomers.

While there are several different naming conventions for the compounds in this case, two predominate: the Fischer-Rosanoff convention, which labels isomers either with an "L" or a "D," based on the isomer's relation to the glyceraldehyde molecule, and the Cahn-Ingold-Prelog convention, a more formal stereochemical naming convention that uses the symbols "S" and "R" to describe the isomer's relation to the carbon atom. In the context of folates, L is used to refer to the naturally occurring isomer and D refers to the unnaturally occurring

5

isomer, although the more standard naming conventions would use "S" for a naturally occurring isomer and an "R" for the unnatural isomer. It is important that in nature, each tetrahydrofolate form exists in the "L" (or "S") stereochemical form, though it can also be synthetically manufactured. If synthetically manufactured, a folate would be "mixed," and this form would be identified as having both "L" and "D" (or "S" and "R") stereochemical forms: i.e., a mixed compound would be labeled as "D,L" or "R,S."

As discussed further below, these naming conventions and how particular folate forms are labeled are central to the false advertising claims in this case. Thus, for ease of reference, we use the same naming convention used by the district court: we will generally refer to the naturally occurring isomer as the "6S Isomer Product," and the synthetically created isomer as a "6R,S Mixture Product."[1] *See Merck I*, 901 F. Supp. 2d at 445.

**B.    Merck and Metafolin**

Merck & Cie (formerly Merck Eprova AG) is a Swiss corporation and producer of pharmaceutical and dietary ingredients. Since 2002, Merck has sold a

---

[1] The "6" indicates the particular configuration that exists at the carbon 6 position, for example, "6R,S."

folate product under the name METAFOLIN ("Metafolin"). Metafolin is sold in bulk to customers who use it in various finished products for resale, including vitamins and dietary and nutritional supplements.

Metafolin is comprised of a naturally occurring, biologically active form of Methyltetrahydrofolate ("5-MTHF"). Merck was the first company to manufacture a pure and stable diastereoisomer of L-5-MTHF, a 6S Isomer Product, as a commercial source. Merck's development of Metafolin was the culmination of decades of research and the investment of tens of millions of dollars. Metafolin is one of Merck's most important products.

**C.      Gnosis and Extrafolate**

Gnosis S.p.a. is an Italian corporation and Gnosis Bioresearch S.A. is a Swiss corporation (collectively, "Gnosis"). Gnosis, like Merck, produces raw dietary ingredients for use in the production of nutritional supplements. *Merck I*, 901 F. Supp. 2d at 446. Since 2006, Gnosis has sold a folate product called Extrafolate.[2] Extrafolate is a tetrahydrofolate with two isomers that is a mixture of the S isomer and the R isomer. Extrafolate is a 6R,S Mixture product, or a "D,L-

_____

[2] Starting in 2009, Gnosis began selling a "nearly pure" 6S Isomer Product, which is not a part of this litigation. *See Merck I*, 901 F. Supp. 2d at 443 n.3.

7

5-MTHF" product. D-5-MTHF does not occur in nature, and has not been found to have the same nutritional benefits to humans as the L-5-MTHF product. As a mixture product, Extrafolate sells for significantly less than Metafolin. (*Compare* Metafolin Purchase Order, selling for $14,310 per kg [PTX 72] *with* AHD's Extrafolate Purchase Order, selling for $4,500 per kg [PTX81].)

Between 2006 and 2009 Gnosis printed product specification sheets, brochures and other marketing materials that used the chemical descriptions, terms, and formulas attributed to the pure 6S Isomer Product for the sale and marketing of Extrafolate, its 6R,S Mixture Product. Gnosis had six customers to whom it sold its 6R,S Mixture Product during this time: AHD, Prothera, Thorne, Aceto, Manhattan Drug, and Isochem. Gnosis sold to some of these customers directly, such as AHD and Aceto, and the others indirectly.

In 2007, Merck sued Gnosis, claiming misleading advertising in connection with its use of the pure Isomer Product chemical name and properties in its marketing materials for Extrafolate.

**II.    Bench Trial**

Following a bench trial, the district court determined that Merck had established Gnosis's liability for false advertising under Section 43(a) of the

8

Lanham Act, 15 U.S.C. § 1125(a). *Merck I*, 901 F. Supp. 2d at 442. The court awarded damages, prejudgment interest, and attorney's fees, and imposed a corrective advertising injunction. We provide an overview of the conclusions pertinent to this appeal.

### A. Liability under the Lanham Act

#### 1. Literal and Implied Falsity

The district court concluded that Gnosis recognized that the 6R,S Mixture Product and the 6S Isomer Product had different chemical names. *Id.* at 447. Gnosis had provided (1) product specification sheets to potential customers, and (2) brochures at sales presentations, and when it delivered its Extrafolate product to customers, included (3) product data sheets, certificates of analysis, and material safety data sheets, all of which identified Gnosis's Extrafolate product by the common name or abbreviation for the <u>pure 6S Isomer Product</u>, rather than the 6R,S Mixture Product, and described the chemical properties of the pure product in all of this material. *Id.* at 446-48. Gnosis continued to distribute this advertising material until 2009, nearly two years after Merck commenced this litigation against Gnosis. *Id.* at 446**.**

9

From these factual findings, the district court held that Merck had demonstrated the literal falsity of Gnosis's use of the common name and abbreviation on its product specification sheets, *id.* at 451, and its brochures, certificates of analysis, and material safety data sheets, *id.* at 451-52. The court also concluded that Gnosis's descriptions of the chemical properties of the pure 6S Isomer Product in its brochures, material safety data sheets, and certificates of analysis constituted false advertising because Gnosis's Extrafolate is not a pure 6S Isomer Product, and as such, though the descriptions were literally true, Gnosis had made impliedly false statements that were intended to mislead customers. *Id.* at 455. In essence, Gnosis was accurately describing a product it was not selling.[3]

### 2.   Customer Confusion

The district court also held that Gnosis had used the common name and abbreviation as part of a concerted and organized campaign to deceive customers. *Id.* at 451-55. Merck presented evidence, including the testimony of

---

[3] That is, the chemical properties were "literally true" in that they described the chemical makeup of a pure 6S Isomer Product. What made them literally true but <u>impliedly false</u> is that these 6S Isomer chemical descriptions were used in the marketing for a 6R,S Mixed Product. *See Merck I*, 901 F. Supp. 2d at 455.

Gnosis's own expert Dr. Davide Bianchi, that the use of the pure isomer name is *never* used to refer to anything but the 6S isomer. Trial Tr. 340:13-16, 342:19-22, 351:23-352:2, 357, 572:18-21. Evidence was also presented that privately, Gnosis referred to Extrafolate with the "correct" nomenclature. For example, in its own internal correspondence in the laboratory, Gnosis referred to its product as "5-MTHF" (not as L-5MTHF) which Dr. Bianchi conceded was the "common name of the mixture product," *id.* at 372-73.[4] This same common name for the mixture product (5-MTHF) was also used in the patent application that Gnosis filed. *See* Tr. at 304-05.

The district court emphasized that it found Gnosis's story of how it came to opine that its 6R,S Mixture Product should be labeled as a 6S Isomer Product to be "simply fanciful—and false—and discount[ed] it entirely." *Merck I*, 901 F. Supp. 2d at 453. The court pointed to testimony by Gnosis's witness Professor Ermanno Antonio Valoti, who had testified that he had read "two or three" articles that referred to the mixture substance as L-5-MTHF, but he could not recall the names of the articles. *Id.* at 453-54. The following trial day, counsel for Gnosis represented to the court that he had reviewed the documents referred to

---

[4] "The failure to use 'D,L' or 'R,S' in front of the common name can indicate a mixture of stereoisomers." Weibel Aff. ¶ 40.

by Valoti, and that "[t]hey do not . . . exactly have the L-5-MTHF." Trial. Tr. at 273:6-7. The court concluded that "Gnosis's use of the common name and abbreviation in its marketing efforts was a calculated decision to copy Merck's advertising and capture a portion of Merck's market share, knowing full well that its 6R,S Mixture Product was materially distinguishable from Merck's pure 6S Isomer Product." *Merck I*, 901 F. Supp. 2d at 454.

The court determined that Merck was entitled to a presumption of deception with regard to brochures, material safety data sheets, certificates of analysis, and emails that Gnosis sent to customers. *Id.* at 455. It relatedly found that Gnosis's conduct was deliberate, "in flagrant disregard of prevailing scientific conventions," and that Gnosis "intentionally set out to deceive the public." *Id.* (internal quotation marks omitted).

**3.     Injury to Merck**

With respect to the statements found to be literally false, the court concluded that because Merck and Gnosis were competitors in the folate market, injury to Merck was presumed. *Id.* at 451. Using a legal presumption, the court found injury to Merck with regard to the product specification sheets, the common name of the pure Isomer Product on brochures, certificates of analysis

12

and material safety data sheets. *Id.* Regarding the chemical description of the 6S

Isomer Product on Gnosis's brochures, material safety data sheets, and

certificates of analysis, which the court had found literally true, but impliedly

false, the court similarly presumed injury to Merck. *Id.* at 455.

**B.      Damages**

After concluding that Gnosis was liable under the Lanham Act, the court

determined that damages were warranted, in the form of Gnosis's profits, for

three reasons: (1) "to prevent Gnosis from falsely advertising in the future," (2) to

prevent Gnosis's unjust enrichment, and (3) to compensate for Merck's lost sales.

*Id.* at 457-59.

The court also noted that "Gnosis's continued use of the terms L-5-MTHF

and L5-methyltetrahydrofolic acid in its advertising for almost two years after

Merck initiated this suit evinces that Gnosis gave little consideration to this suit

and more than supports a finding of willfulness." *Id.* at 458. The court concluded

that the balance of equities favored the award of Gnosis's profits from its sale of

Extrafolate. Because Gnosis only provided the court with costs from 2011 and

2010, "well after the profits at issue here," it had not met its burden of producing

evidence that would limit the amount of profits awarded to Merck. *Id.* at 459.

13

The court determined that "equity" dictated that the profits be "enhanced to best reflect the intangible benefits that accrued to Gnosis as a result of its false advertising." *Id.* at 460-61. The court awarded Merck an award of three times Gnosis's profits, for a total of $526,994.13, and prejudgment interest from the time Gnosis first entered the market (March 2006) until the date of the opinion (September 30, 2012). *Id.* Finally, the court ordered Gnosis to engage in a corrective advertising campaign "to explain the differences between the pure 6S Isomer Product and the 6R,S Mixture Product," and awarded attorneys' fees and costs. *Id.* at 463; *Merck II*, 2013 WL 364213, at *1.

**DISCUSSION**

On appeal, Gnosis challenges the district court's conclusion that consumer confusion and injury could be presumed in light of its factual findings, asserting that the court improperly relied on cases involving comparative advertising. Gnosis asserts that the district court's award of damages on the basis of a presumption of customer confusion and a presumption of injury was improper, because proof of actual consumer confusion and evidence of actual injury to Merck was necessary. Next, Gnosis argues that it was error to award Merck all of Gnosis profits, and further error to enhance the profits by trebling them. Gnosis

14

also challenges the court's imposition of a corrective advertising injunction, prejudgment interest, and the award of attorneys' fees and costs. Gnosis asks that on remand, we order that the case be assigned to a different judge so as to "ensure . . . impartiality."

"When reviewing a judgment following a bench trial in the district court, we review the court's findings of fact for clear error and its conclusions of law *de novo*." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 96 (2d Cir. 2010).

## I. <u>Liability Under the Lanham Act</u>

To establish false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the plaintiff must first demonstrate that the statement in the challenged advertisement is false. A false advertising claim may be based on one of two "theories." *Tiffany (NJ) Inc.*, 600 F.3d at 112. "Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001) (internal quotation marks omitted). "[I]n addition to proving falsity, the plaintiff must also show that the defendants misrepresented an inherent quality or characteristic of the product," *id.* (internal quotation marks omitted); that "the

15

defendant placed the false or misleading statement in interstate commerce," *Cashmere & Camel Hair Mftrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311 (1st Cir. 2002) and that "the plaintiff has been . . . injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products," *id.*

"Where an advertising claim is literally false, 'the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public.'" *Tiffany (NJ) Inc.*, 600 F.3d at 112 (quoting *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991)). And even in cases of implied falsity, "'where a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public,' and the defendant's 'deliberate conduct' in this regard is of an 'egregious nature,' a presumption arises that 'consumers are, in fact, being deceived.'" *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298-99 (2d Cir. 1992) (quoting *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.*, 926 F.2d 134, 140 (2d Cir. 1991)). "In such a case, once a plaintiff establishes deceptive intent, 'the burden shifts to the defendant to demonstrate the absence of consumer confusion.'" *Id.* at 299 (quoting *Resource Developers*, 926 F.2d at 140).

## A. Presumption of Consumer Confusion

We reject at the outset Gnosis's argument that the district court erred in imposing a presumption of confusion. We have stated that

> [I]t is well settled that in order for a Lanham Act plaintiff to receive an award of damages the plaintiff must prove either actual consumer confusion or deception resulting from the violation, *or* that *the defendant's actions were intentionally deceptive* thus giving rise to a rebuttable presumption of consumer confusion.

*George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992) (emphasis added) (internal quotation marks and citations omitted). Given the district court's finding that Gnosis "intentionally set out to deceive the public," *Merck I*, 901 F. Supp. 2d at 455, a factual finding that Gnosis does not challenge on appeal, the only question is whether after determining that the facts gave rise to a presumption of confusion, the court properly dealt with the presumption.

### 1. Literal Falsity (Use of the Pure Isomer's common name in Extrafolate Product Specification Sheets, Brochures, Certificates of Analysis, and Material Safety Data Sheets)

Here, the district court found that the majority of Gnosis's challenged publications were literally false: that is, Gnosis's use of the common name for the pure 6S product in its product specification sheets, brochures, certificates of analysis, and material safety data sheets for its Extrafolate product, was a literally

17

false description of Extrafolate, a mixed product. The court's finding that the use of the pure Isomer name on these publications was literally false in that Extrafolate itself was a mixed product is not clearly erroneous, nor is it a finding challenged by Gnosis on appeal.

We have held in the past that where a defendant's advertising of products is literally false, a Lanham Act plaintiff need not "provide evidence of actual consumer confusion by resort to witness testimony, consumer surveys, or other such evidence in order to establish entitlement to damages under the Lanham Act." *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 273 (2d Cir. 1987) *abrogated on other grounds, as recognized in Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 n.9 (2d Cir. 1998); *see also id.* ("Audiofidelity's products were patently fraudulent, and the advertising accompanying those products was the vehicle employed to perpetrate the fraud.").

In light of this factual finding of literal falsity, the district court was correct to presume consumer confusion from Gnosis's marketing specification sheets, brochures, data sheets, and certificates of analysis. *See Time Warner Cable, Inc. v. DirecTV*, 497 F.3d 144, 153 (2d Cir. 2007) ("When an advertisement is shown to be literally or facially false, consumer deception is presumed, and 'the court may

18

grant relief without reference to the advertisement's [actual] impact on the buying public." (quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982) (alteration in original)). Once literal falsity—an unchallenged factual finding—was proved, no further evidence of actual consumer confusion was necessary. *See PPX*, 818 F.2d at 273.

2.     **Implied Falsity (Chemical Description of the Pure Isomer on Extrafolate Marketing Materials)**

With respect to the chemical description of the Pure Isomer in brochures, material safety data sheets, and certificates of analysis, the court concluded that the description was literally true "when applied to the pure product," but used in a manner that was intended to mislead consumers as to the mixed product Gnosis was actually selling. *Merck I*, 901 F. Supp. 2d at 455.

The intention to mislead is certainly clear: Gnosis put a description of the chemical properties of the <u>Pure Isomer 6S</u> product on its Extrafolate materials in order to mislead consumers into believing that they were, in fact, purchasing a Pure Isomer 6S product rather than the 6R,S Mixture Product, Extrafolate. "In such a case, once a plaintiff establishes deceptive intent, 'the burden shifts to the

defendant to demonstrate the absence of consumer confusion.'" *Johnson &*

*Johnson*, 960 F.2d at 299 (quoting *Resource Developers*, 926 F.2d at 140).

The court specifically noted that Gnosis's intent to deceive the public

merited the imposition of "a presumption of deceit," *Merck I*, 901 F. Supp. 2d at

455, and that the burden thus shifted to Gnosis in order to demonstrate an

absence of confusion. *Id.* The court emphasized that "Gnosis 'intentionally set out

to deceive the public.'" *Id.* (quoting *Johnson & Johnson*, 960 F.2d at 298). In so

finding, the court never specifically addressed why the record put forward by

Gnosis was insufficient to demonstrate an absence of consumer confusion.

Rule 52 of the Federal Rules of Civil Procedure requires that "[i]n an action

tried on the facts without a jury . . . the court must find the facts specially and

state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). Here, with respect

to its findings on implied falsity and whether Gnosis had failed to demonstrate

an absence of consumer confusion, the court did not explicitly do so. Merck

argues that there was no Rule 52 violation because Rule 52(a) only requires the

district court to "make sufficiently detailed findings to inform the appellate court

of the basis of the decision and to permit intelligent appellate review." *Krieger v.*

20

*Gold Bond Bldg. Prods., a Div. of Nat'l Gypsum Co.*, 863 F.2d 1091, 1097 (2d Cir. 1988)).)

"[W]e may proceed with our review despite inadequate findings if we can discern enough solid facts from the record to enable us to render a decision." *Tekkno Labs, Inc. v. Perales*, 933 F.3d 1093, 1097 (2d Cir. 1991) (internal quotation marks and alterations omitted). While the district court should have explained why Gnosis had failed to rebut the presumption, we conclude that the record strongly supports a finding of actual consumer confusion, and does not support the converse; i.e., a conclusion that customers were not confused.

Though Gnosis maintains that all of its sales during the period in question were to entities that knew they were purchasing the mixture product, this assertion is belied by the trial record. There are more than enough "solid facts" in the trial record to support a finding that Gnosis's consumers were, in fact, confused by the product they were buying. For example, there is evidence that AHD was confused as to whether it was buying a 50% or 98% active Isomer Product, and Nature's Value believed that it was purchasing a pure 6S Isomer Product, *see* Trial Tr. 702-03, as did Swanson, *see* Roxane England Dep. Tr. at 94-95, 107-08; *see also* PTX 80; Isochem; and Thorne.

21

There was evidence presented that Gnosis's direct customers were confused as to what product they were purchasing. Gnosis claimed that AHD and Thorne were not confused, and clearly understood the products they were purchasing during the relevant period. While there is some testimony to that effect , that evidence is overwhelmed by other testimony, including from an AHD witness that there was some confusion initially that needed to be cleared up about the differences between the Extrafolate mixed product and a high isomer (i.e., a pure isomer) product.

Further, there was ample testimony that AHD's own customers, Swanson's and Nature's Value, were confused. Swanson's executive testified that after it received a subpoena from Merck, it stopped selling its Activated B-Complex, because "after we read the documents, we found out that we may not be certain what the [folate] ingredient is." England Dep. Tr. at 50-51. Swanson's witness further testified that Swanson's initial understanding was that it was receiving "pure L-5-methyltetrahydrofolate" from Gnosis. *Id.* at 95. Lori Newburg, a witness from Nature's Value, the company that formulated the Activated B Complex for Swanson, testified that Nature's Value relied on the certificate of analysis provided by AHD, when determining the composition of its folate

product from Gnosis. Trial Tr. at 693:10-14. Newburg testified that what Nature's Value believed it had ordered from Gnosis (via Gnosis's sales agent, AHD) was the pure form of the product: "I've never even known that a D,L [i.e., R,S, or "mixed"] form exists. I've not worked with any." *Id.* at 695-96. She agreed that Nature's Value would have rejected the material if she "understood it to be the DL form instead of the L form." *Id.* at 702.

Isochem's witness also testified that based on the labeling, Isochem thought it was purchasing the "L form." And Thorne, another customer, had sent an email to Gnosis (through sales agent AHD) in 2007 asking "is 5-MHTF a R or an S isomer, or a . . . mixture?" *Id.* at 1032. Gnosis's CEO conceded that it "would seem to be the case" that Thorne did not know that it had been receiving a mixture product. *Id.* at 1033.

In light of this evidence, even assuming that some of Gnosis's direct customers were not confused about what they were purchasing from Gnosis, the record readily supports the conclusion that "a significant number of consumers" were misled by Gnosis's false labeling. *See Coca-Cola*, 690 F.2d at 317; *see also Johnson & Johnson*, 960 F.2d at 298. As such, the district court's implicit conclusion

23

that Gnosis had failed to demonstrate an absence of confusion is adequately supported by the record.

Finally, as mentioned above, this case presents us with two theories of false advertising liability: literal falsity *and* implied falsity. The district court found both literal and implied falsity in Gnosis's marketing materials, and found deliberate deception. None of these factual findings or legal conclusions are challenged by Gnosis on appeal. Because we could affirm the district court's finding of consumer confusion based on its findings of literal falsity alone, *see Time Warner*, 497 F.3d at 158, we need not, and do not, decide whether the district court's failure to squarely address Gnosis's rebuttal evidence, with respect to the literally true, but impliedly false statements, warrants remand. In this case, the findings of literal falsity and the "egregious nature" of Gnosis's deliberate intent to deceive the purchasing public support the imposition of a presumption of consumer confusion. *See Resource Developers*, 926 F.2d at 140; *PPX*, 818 F.2d at 272.

### B. Presumption of Injury to Merck

We next turn to the second presumption applied in this case, and whether it was appropriate to presume injury to Merck under the circumstances.

We reject Gnosis's initial assertion that a presumption of injury is only applicable to cases of comparative advertising mentioning the plaintiff's product by name. Indeed, as discussed in greater detail below, the very case that Gnosis relies on, *Time Warner*, 497 F.3d at 144, involved a false advertising Lanham Act claim in which the defendant never mentioned Time Warner directly in its television ads.

In cases where, as here, the district court has found literal falsity, we have never required a finding of extrinsic evidence of injury to consumers or to the plaintiff. *See Tiffany*, 600 F.3d at 112-13. Because the case law has developed with a particular focus on comparative advertising, we provide a brief overview of our Court's jurisprudence on comparative advertising cases.

In *McNeilab, Inc. v. American Home Prods. Corp.*, 848 F.2d 34, 38 (1988) we distinguished two types of false advertising cases and the presumptions they permit: (1) "misleading, non-comparative commercials which touted the benefits of the products advertised but made no direct reference to any competitor's product," and (2) "a false comparative advertising claim." We noted that "[a] misleading comparison to a *specific competing product* necessarily diminishes that product's value in the minds of the consumer." *Id.* (emphasis added). In the first

25

type of case (i.e., non-comparative advertising), the injury "accrues equally to all competitors; none is more likely to suffer from the offending broadcasts than any other." *Id.* In those types of cases, "some indication of actual injury and causation" would be necessary in order to ensure that a plaintiff's injury is not speculative. *Id.* However, in the second type of case, (i.e., "comparative advertising"), we concluded that injury may be presumed, because there was not the same concern of awarding damages for merely speculative injury: "[b]y falsely implying that Advil is as safe as Tylenol in all respects, [American Home Products] deprived McNeil of a legitimate competitive advantage and reduced consumers' incentive to select Tylenol rather than Advil." *Id.* Analogizing the case to a Lanham Act trademark dispute, we reasoned that "[a]n infringing mark, by its nature, detracts from the value of the mark with which it is confused," and that in such a comparative advertising context, "irreparable harm will be presumed." *Id.*

In *Time Warner*, which involved DirecTV advertisements touting the poor picture quality of "cable" generally, we extended the rationale from *McNeilab*, and held that even though the challenged advertisements never actually mentioned Time Warner Cable by name, "the rationale for a presumption of

26

irreparable harm applies with equal force" because Time Warner "*is* 'cable' in the areas where it is the franchisee." 497 F.3d at 162. We concluded that "even though [the commercial] does not identify [Time Warner] by name, consumers . . . undoubtedly understand [the] derogatory statement, 'settling for cable would be illogical,' as referring to [Time Warner]," and held that the district court had properly accorded the plaintiff a presumption of irreparable harm. *Id.* (citing *McNeilab*, 848 F.3d at 38).

On a superficial level, Gnosis is correct that this case is not the typical comparative advertising case, at least as previously contemplated by our Court. That is, unlike in *McNeilab*, Gnosis did not disparage Merck by actually mentioning Merck's name in an advertisement. This case also is distinguishable from *Time Warner*, where DirecTV's advertisements, which disparaged 'cable' generally, were obviously targeted at the only cable provider in their region—Time Warner. However, *Time Warner* is instructive, in that it involved a two-player market, like we have here. In *Time Warner*, we emphasized that the district court's imposition of a presumption of harm was proper for the purposes of imposing the injunctive relief sought by Time Warner. 497 F.3d at 162.

27

Gnosis points to *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329 (8th Cir. 1997) to argue that this is not a comparative advertising case, because here, the misrepresentation is only by Gnosis, and only concerns Gnosis's own product. In *Porous Media*, the Eighth Circuit echoed the concerns we had raised in *McNeilab* about speculative injury in certain Lanham Act cases, reasoning:

> [W]here a defendant is guilty of misrepresenting its own product without targeting any other specific product, it is erroneous to apply a rebuttable presumption of harm in favor of a competitor. Otherwise, a plaintiff might enjoy a windfall from a speculative award of damages by simply being a competitor in the same market.

110 F.3d at 1334. However, Gnosis neglects to cite to the following important language later in the *Porous* opinion:

> We find that in comparative advertising cases where money damages are sought and where there exists proof of willful deception, as here, the reasoning of the injunction cases set forth primarily in the Second Circuit cases is applicable. What little case law exists supports the district court's use of the *presumption of causation and harm* to the plaintiff.

110 F.3d at 1336 (emphasis added). The *Porous* court noted that, "[a] predicate finding of intentional deception, as a major part of the defendant's marketing efforts, *contained in comparative advertising,* encompasses sufficient harm to justify a rebuttable presumption of causation and injury in fact." *Id.*

28

The district court clearly considered, and was persuaded by, the fact that this was a market with only two direct competitors. The factual record supports the district court's finding that Gnosis capitalized on consumers' desire to purchase a Pure Isomer Product by using the Pure Isomer's common name in its brochures and marketing materials. Because its only competitor for such a pure product at the time was Merck, it follows that Merck was damaged by Gnosis's false advertising of a mixed product as a pure one. While "our circuit has expressly disfavored presumptions of harm in cases where the *products are not obviously in competition* or where the defendant's advertisements make no direct reference to any competitor's products," *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 696 (2d Cir. 1994) (citing *McNeilab, Inc.*, 848 F.2d at 38; *Coca-Cola Co.*, 690 F.2d at 316; *Johnson & Johnson*, 631 F.2d at 190) (emphasis added), the products and parties here are obviously in direct competition. That they are in direct competition in the folate market, and Gnosis's falsely labeled Extrafolate cost significantly less than Merck's Metafolin, only exacerbates the extent of the injury to Merck.

We hold that where, as here, a plaintiff has met its burden of proving deliberate deception in the context of a two-player market, it is appropriate to

29

utilize a presumption of injury. This is the case even if it is not a classic instance of comparative advertising where one company's advertisement mentions a competitor's product by name. In the context of the market at the time of this lawsuit for a pure folate—a market created by Merck and entered into and exploited by Gnosis through its false advertising of a mixed product as pure—the district court's utilization of a presumption of injury carries no risk of speculative injury to Merck. The court's analysis was sound, and we affirm its use of the legal presumption in this context.

## II. <u>Damages</u>

The Lanham Act specifically contemplates an award of profits, damages and costs. Section 35 provides in pertinent part:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, . . . shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . . In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the

30

recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

15 U.S.C. § 1117(a). We review a district court's factual finding for clear error and damages award for abuse of discretion. *See George Basch*, 968 F.2d at 1537.

**A.    Lost Profits**

"[U]nder any theory, a finding of defendant's willful deceptiveness is a prerequisite for awarding profits." *Id.* "[A] profits award, premised upon a theory of unjust enrichment, requires a showing of actual consumer confusion—or at least proof of deceptive intent so as to raise the rebuttable presumption of consumer confusion." *Id.* at 1538 (citing *Resource Developers*, 926 F.2d at 140; *PPX Enterprises*, 818 F.2d at 273). "A district court's determination of willfulness is reviewed for clear error." *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (1995).

We have held that disgorged profits may be awarded in the interests of deterrence. "[A] court may award a defendant's profits solely upon a finding that the defendant fraudulently used the plaintiff's mark." *George Basch*, 968 F.2d at 1539 (citing *Monsanto Chemical Co. v. Perfect Fit Mfg. Co.*, 349 F.2d 389, 396 (2d Cir.

31

1965)). The deterrence rationale "is not compensatory in nature, but rather seeks to protect the public at large." *Id.*; *see also W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir. 1970) ("It is essential to deter companies from willfully infringing a competitor's mark, and the only way the courts can fashion a strong enough deterrent is to see to it that a company found guilty of willful infringement shall lose all its profits from its use of the infringing mark.").

We conclude that the district court's decision to award Gnosis's Extrafolate profits from the period in question to Merck was not an abuse of discretion. The district court found willful deception, a finding that is not clearly erroneous, and reasoned further that the award of profits was necessary to deter future unlawful conduct, prevent Gnosis's unjust enrichment, and compensate Merck for the business it lost as a result of the false advertising that led certain customers to believe they were purchasing a Pure Isomer Product from Gnosis. *Merck I*, 901 F. Supp. 2d at 457-60. These are all appropriate rationales for determining that an award of profits is warranted in a false advertising case. *See George Basch*, 968 F.2d at 1537-39 (discussing three "theories" under which a district court may award profits under Section 35 of the Lanham Act: (1) unjust enrichment, (2) compensation, and (3) deterrence).

32

Our precedent permits a district court to award a defendant's full profits based solely on deterrence. *See id.* at 1539 ("[W]e have held that a court may award a defendant's profits *solely* upon a finding that the defendant fraudulently used the plaintiff's mark. . . . By awarding the profits of a bad faith infringer to the rightful owner of a mark, we promote the secondary effect of deterring public fraud regarding the source and quality of consumer goods and services.") (emphasis added) (citation omitted). The question is whether an award of profits requires more than the operation of legal presumptions as evidence of injury and consumer confusion to a false advertising plaintiff.

In a false advertising case such as this one, where the parties are direct competitors in a two-player market, and where literal falsity and willful, deliberate deception have been proved, the presumptions of injury and consumer confusion may be used for the purposes of awarding both injunctive relief *and* monetary damages to a successful plaintiff. We have already suggested that this may be appropriate in false advertising cases involving literal falsity. In *PPX*, we noted that in false advertising cases of literal falsity seeking injunctive relief, courts have granted relief based "on the court's own findings without reference to the reaction of the buyer or consumer of the product." 818 F.2d at 272 (internal

33

quotation marks omitted). We reasoned further that "we perceive no reason why the same logic should not apply in regard to claims for damages, given the . . . egregious nature of [defendant's] actions." *Id.* (internal citation omitted). "[T]he distinction drawn between stating a claim for injunctive relief and establishing entitlement to damages has less relevance in the context of false advertising." *Id.* "'Having established falsity, the plaintiff should be entitled to both injunctive and monetary relief, regardless of the extent of impact on consumer purchasing decisions.'" *Id.* at 272-73 (quoting Bauer, A Federal Law of Unfair Competition What Should be the Reach of Section 43(a) of the Lanham Act?, 31 UCLA L. Rev. 671, 744 n.277 (1984)). We agree with this reasoning, and reiterate that the presumption of injury may be used as a basis for awarding damages in false advertising cases such as this. Under the circumstances of this case, which we detail in the next section of this opinion, the district court properly awarded damages to Merck in the form of Gnosis's profits. We also affirm the court's calculations of such profits.

**B.  Trebling of Damages**

The district court also determined that an award of Gnosis's profits did not sufficiently reflect the total harm caused to Merck. *Merck I*, 901 F. Supp. 2d at 460.

34

Citing the principles of equity, the court concluded that enhanced damages were warranted, not as a punishment or penalty—which are not permitted under the Lanham Act, *see Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir. 1988)—but to "reflect the intangible benefits that accrued to Gnosis as a result of its false advertising," and in particular, "Gnosis's usurpation of Merck's market share." *Merck I*, 901 F. Supp. 2d at 460. We hold that the Lanham Act permits enhanced damages in such a situation, and find no abuse of discretion in the court's decision to enhance the damages awarded to Merck.

Section 35 of the Lanham Act specifically provides that "if the court shall find that the amount of the recovery based on profits is inadequate[,] . . . the court may in its discretion enter judgment for such sum as the court shall find to be just." 15 U.S.C. § 1117(a). While this enhancement provision, introduced in 1905, "was included to enable courts to redress fully plaintiffs whose actual damages were difficult to prove," *Getty*, 858 F.2d at 110, we have since reasoned that enhanced damages may also be awarded under Section 35 where "deterrence of willful infringement is needed." *Id.* at 113.

The district court clearly set forth its rationale for enhancing the profits award, stating that "'principles of equity' dictate that an award of Gnosis's

profits should be enhanced to best reflect the intangible benefits that accrued to Gnosis as a result of its false advertising," *Merck I*, 901 F. Supp. 2d at 460 (quoting 15 U.S.C. § 1117(a)), and explaining that "[t]hough an award of three times profit is an imprecise measure of compensation, the impossibility of gauging Merck's losses along with the undeniable existence of those losses makes it a proper, if crude, measure." *Id.* at 461 (citing *Getty*, 858 F.2d at 110). The particulars of this case, including that Merck was the *only* manufacturer of the pure 6S Isomer Product prior to Gnosis's entry into the folate market, and that Gnosis continued to market its Extrafolate product under the common name for the pure isomer for two years *after* Merck commenced suit against Gnosis, and two years after Merck settled a separate false advertising suit against sales agent AHD and AHD itself ceased to distribute Gnosis's mixture product, render this matter one that is particularly appropriate for enhanced damages. Gnosis was unjustly enriched as a result of its false advertising, and, in light of Gnosis's demonstrated deceptive and willful conduct—manifested by its stubborn persistence—the court's conclusion that enhanced damages were needed to deter Gnosis from any future willful infringement was not an abuse of discretion.

Other cases that present less egregious, willful conduct on the part of the infringing party may not warrant such an enhanced damages award. As laid out in Section 35, the question of what sum the district court finds to be "just, according to the circumstances of the case," is a case-specific inquiry. 15 U.S.C. § 1117(a). Here, the decision to award enhanced damages for the reasons stated cannot be said to be an abuse of the district court's discretion. We therefore affirm.

### C. Other Relief Awarded and Sought

We reject the remaining challenges to the district court's opinion and order. As set out below, none of the decisions—including the award of prejudgment interest and attorney's fees, and imposing a corrective advertising injunction—constitute an abuse of the court's discretion.

#### 1. Prejudgment Interest

Gnosis contends that the court's award of prejudgment interest to Merck was reversible error, because the award of trebled profits already compensated Merck for the loss of the use of any money.

"Although Section 1117(a) does not provide for prejudgment interest, such an award is within the discretion of the trial court and is normally reserved for

37

'exceptional' cases." *Am. Honda Motor Co., Inc. v. Two Wheel Corp.*, 918 F.2d 1060, 1064 (2d Cir. 1990).

There was no abuse of discretion here. The district court's opinion reiterates the exceptional nature of this case throughout, highlighting Gnosis's willfulness and bad faith, as well as the fact that Merck was the only manufacturer of the Pure Isomer Product at the time Gnosis entered the market with its intentionally mis-labeled 6R,S Mixture Product. *Merck I*, 901 F. Supp. 2d at 457-61, 63. Certainly, it would have been preferable for the district court to explicitly state its reasons for awarding prejudgment interest. *See, e.g.*, *Nat'l Ass'n for Specialty Food Trade, Inc. v. Construct Data Verlag AG*, No. 04 Civ. 2983(DLC)(KNF), 2006 WL 5804603, at * 7 (S.D.N.Y. Dec. 11, 2006) ("In the case at bar, the Court finds that awarding prejudgment interest to the plaintiff is appropriate to give effect to the compensatory scheme Congress contemplated would be employed when trademark rights have been infringed."), *Report and Recommendation of Magistrate Judge adopted*, 2007 WL 656274 (S.D.N.Y. Feb. 23, 2007); *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 307 (S.D.N.Y. 2002) ("In light of Solid's willful intent to profit illegally from the goodwill of GTFM's '05' brand, prejudgment interest is appropriate in this case."). However, the

factual record readily supports the district court's findings of willfulness and bad faith, and the conclusion that this is such an exceptional case as to warrant an award of pre-judgment interest pursuant to Section 1117(a) is therefore affirmed. *See* S. Rep. No. 93-1400, at 2 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7132, 7133 (describing "exceptional cases" under the Lanham Act as cases where infringement is "malicious," "deliberate," or "willful").

### 2. Corrective Advertising Injunction

The district court's order of corrective advertising required the following:

> (1) the ads shall disclose that the campaign is court-ordered to provide consumers with context for Defendants' clarification. However, (2) the ads need not disclose that Defendants' misrepresentations were willful as that is immaterial to the content of the false advertisement. Similarly, (3) the ads shall provide a link to the Court's opinion to provide greater context; however, the Opinion need not be hosted on Alston & Bird's [Merck's counsel] website. Additionally, (4) the ads shall run on Defendants' homepage as well as their products' sale page to ensure sufficient market dissemination. Finally, (5-6) the ads need only run on third-party industry websites and in trade magazines where the offending products were or are presently advertised by Gnosis.

*Merck II*, 2013 WL 364213, at *7. In *Merck I*, the court explained that the purpose of the corrective advertising campaign was "to explain the differences between the pure 6S Isomer Product and the 6R,S Mixture Product." 901 F. Supp. 2d at 463.

Gnosis contends that this corrective advertising campaign, when paired with the district court's award of damages, constitutes an unfair double recovery. However, the cases Gnosis relied on for this proposition all involve monetary awards following trials where prospective corrective advertising damages were sought and awarded. *See, e.g.*, *Callaway Golf Co. v. Slazenger*, 384 F. Supp. 2d 735, 742 (D. Del. 2005) (vacatur of a jury award for prospective corrective advertising, where jury had awarded an identical sum in unjust enrichment damages). Here, no damages were awarded by the district court for corrective advertising.

Further, Gnosis's assertion that it is improper to award damages *and* a corrective advertising campaign is unsupported by the case law. "In a false-advertising case such as this one, actual damages under section 35(a) can include":

> —profits lost by the plaintiff on sales actually diverted to the false advertiser; —profits lost by the plaintiff on sales made at prices reduced as a demonstrated result of the false advertising; —the costs of any completed advertising that actually and reasonably responds to the defendant's offending ads; and —quantifiable harm to the plaintiff's good will, to the extent that completed corrective advertising has not repaired that harm.

*ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C. Cir. 1990) (internal citations omitted); *see also id.* at 971 ("In addition to awarding monetary

relief, the district court enjoined both parties to prepare, secure court approval of, and disseminate corrective releases, and it enjoined both parties from renewing their false advertising.").

"It is axiomatic that the contours of an injunction are shaped by the sound discretion of the trial judge and, barring an abuse of that discretion, they will not be altered on appeal." *George Basch*, 968 F.2d at 1542. The specifics of the corrective advertising campaign are narrow in scope and clearly appropriately designed to explain the difference between the 6S Isomer Product and the 6R,S Mixture Products, while providing basic background on the case in the form of a link to the district court's opinion in *Merck I* (which will only be viewed if the curious customer or researcher actually clicks on the link). There was no abuse of discretion here; we affirm the injunction as laid out by the district court.

### 3. Attorney's Fees

The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). As with its award of prejudgment interest, the district court concluded that this was such an exceptional case, and awarded Merck $1,924,962.50 in attorneys' fees and $287,485.88 in costs. *Merck II*, 2013 WL 364213, at *7. The court had previously

41

concluded that Gnosis's false advertising was "willful and done in bad faith," and that "Gnosis's litigation strategy was conducted in bad faith, with senior officials, including [CEO] Berna, frustrating the litigation process at every turn, from withholding documents in discovery and obstructing depositions to testifying falsely under oath at the bench trial in this action." *Merck I*, 901 F. Supp. 2d at 463 (internal citation omitted). The district court reduced the reasonable hourly rate requested, but concluded that "[b]ased on the Court's familiarity with the work performed in this case, as well as the evidence presented of that work and the Court's knowledge of the relevant legal market, the Court does not find that a reduction of hours is appropriate." *Merck II*, 2013 WL 364213, at *5 (citation omitted).

Gnosis asserts that this award of fees and costs was an abuse of discretion, and faults the district court for purportedly failing to trim any fat from Merck's fee application. Gnosis also contends that the attorney fee award is excessive because it greatly exceeds the profits that were at issue in the case. Neither of these arguments support vacatur of the district court's attorney fee award.

"Given the district court's inherent institutional advantages in this area, our review of a district court's fee award is highly deferential." *McDonald ex rel.*

42

*Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91, 96 (2d Cir. 2006); *see also Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) ("What constitutes a reasonable fee is properly committed to the sound discretion of the district court, and will not be overturned absent an abuse of discretion, such as a mistake of law or a clearly erroneous factual finding. Indeed 'abuse of discretion' . . . takes on special significance when reviewing fee decisions."). And specifically in a Lanham Act false advertising case, we have noted that "[t]he finding of willfulness determines the right to attorneys' fees," and that "'[e]xceptional' circumstances include willful infringement." *Bambu*, 58 F.3d at 854.

The district court concluded that the hours expended were reasonable, rejecting Gnosis's challenges to Merck's attorneys' use of block billing, vague descriptions of work, and overabundant staffing. *Merck II*, 2013 WL 364213, at *4. We agree that trial is a "time consuming process." *Id.* (internal quotation marks omitted). We also find the district court did not abuse its discretion in concluding that the hours expended, which pertained to "all work completed in preparation

43

for trial," *id.* at \*4, were reasonable, and gave rise to a "presumptively reasonable fee."[5] *Id.* (internal quotation marks omitted).

As to Gnosis's claim that the fee award is excessive in light of the profits that are issue in this case, Gnosis provides no legal authority for why such a consideration should factor into this Court's review on appeal, citing only to *New York State Ass'n for Retarded Children, Inc. v. Carey*, for its admonishment that "attorney's fees are to be awarded with an eye to moderation, seeking to avoid either the reality or the appearance of awarding windfall fees." 711 F.2d 1136, 1139 (2d Cir. 1983) (internal quotation marks omitted). However, that case focused specifically on the appropriate hourly rate for non-profit attorneys in New York City *in 1980*: even then, we noted that "[w]e do not expect that even in the same community and at the same time each district judge will necessarily select the same 'break point' as a presumptive maximum rate needed to avoid windfall fees to non-profit law offices." *Id.* at 1152. Here, there is no credible claim of a windfall for Merck's attorneys, and further, the district court

_____

[5] We also note that the history of this case and the record below reveals that the court had previously found Gnosis liable for "egregious discovery violations," *Merck II*, 2013 WL 364213, at \*4, including a witness being coached *during his deposition* by Gnosis's CEO. *See* Dist. Ct. Dkt., No. 07 Civ. 5898(RJS), ECF. No. 77, at 8. It is clear that the litigation which was initiated back in *2007* was in part prolonged by Gnosis's conduct over the course of the lawsuit.

considered, and responded to Gnosis's concerns that the attorney fees far outpaced the award: "Defendants fail to account for the actual stakes in this case, namely, the market share of one of Plaintiff's flagship products, and the entirety of Alston & Bird's result, specifically, an injunction barring Defendants' continued falsely advertising." *Merck II*, 2013 WL 364213, at *5. This is no reason to reverse the district court's conclusion of what constituted a presumptively reasonable fee, and we affirm.

Gnosis raises one issue with respect to the district court's award of costs that may have some traction. That is, under 28 U.S.C. § 1821 and the Lanham Act, the district court likely should not have awarded more than $40 per day in expert witness fees, though the district court awarded $121,394.00 in expert witness fees, which clearly exceeded this threshold. *Merck II*, 2013 WL 364213, at *6.

However, Gnosis did not raise this challenge below. "[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994). Gnosis only opposed costs as to "document production charges," "internet research," costs related to "working meals and luxury sedan services," and "unreasonable costs," including Merck's test for the purity of Gnosis's

45

Extrafolate product. The district court addressed each of these arguments. *See Merck II*, 2013 WL 364213, at *6. Gnosis offers no reason for its failure to raise the issue before the district court. *See Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005). We decline to address this issue for the first time on appeal.

### 4. Miscellaneous Relief Requested

Merck requests that we award it fees and costs associated with this appeal. Such an award is not warranted here. Merck is essentially asking that we impose further sanctions for Gnosis's bad faith litigation conduct below, however, Gnosis has already been sanctioned by the district court for its conduct. Thus far, Gnosis has conducted itself in an appropriate manner before our Court, and the issues it raised on appeal are not frivolous.

Finally, in light of our decision today, we do not consider Gnosis's request that we remand the case to a different judge.

### CONCLUSION

For the reasons set forth above, the district court's opinion and orders are AFFIRMED in their entirety.