Filed 1/26/21  Ezeokoli v. Uber Technologies CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BENEDICT EZEOKOLI et al.,<br><br>    Plaintiffs and Appellants,<br>v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>    Defendant and Respondent. | A156445<br><br>(Alameda County<br>Super. Ct. No. RG14747166) |

Plaintiff taxi drivers Benedict Ezeokoli, Zine Salah and Leon Slomovic appeal from a summary judgment in favor of defendant Uber Technologies, Inc. (Uber) on their action for false advertising under the Lanham Act (15 U.S.C. §1125(a) et seq.).  We conclude, as did the trial court, that (1) Uber established a prima facie showing that plaintiffs could not prove they were harmed by the alleged false advertising, and (2) plaintiffs failed to rebut that showing.  We therefore affirm the judgment.

**BACKGROUND**

I.  <u>The Complaint</u>

Plaintiffs' fifth amended complaint, the operative pleading, alleges that Uber disseminated four categories of false or misleading statements and that plaintiffs lost ridership and income as a result.

1

More specifically, the complaint alleged four general categories of misrepresentations: that Uber: (1) misrepresented the availability and proximity of rides through cartoon images of cars displayed on its consumer app; (2) misrepresented the safety of its service; (3) misrepresented the legality of its operations at certain airports; and (4) made false and misleading statements about driver gratuities. Plaintiffs alleged these misrepresentations induced members of the public to use Uber's services rather than plaintiffs' taxis. Plaintiffs also sought to certify a plaintiffs' class of 4,000 taxi drivers in eight California cities.

II. Summary Judgment Motion

Uber moved for summary judgment on grounds including that plaintiffs could not show they had suffered harm or that any harm was caused by the alleged false advertising. Uber also argued plaintiffs lacked standing because they lacked necessary permits or licenses during some of the relevant period. At the same time, it opposed plaintiffs' motion for class certification on the ground that none of the elements of the alleged Lanham Act violations were susceptible to class treatment.

In support of summary judgment, Uber provided evidence that (1) the plaintiffs could not show reduced income from driving taxis during the relevant period; and (2) they could not show that any economic harm was caused by the alleged misrepresentations. Plaintiffs could not establish proximate cause, Uber argued, because their alleged losses "could have resulted from any number of reasons other than customer reliance on the challenged statements," and, as to the challenged statements related to safety concerns, only a very small percentage—fewer than 2.5 percent—of Uber users would have seen them.

2

In opposition, plaintiffs argued Uber failed to show they were unable to establish injury and causation. Alternatively, they argued that even if Uber satisfied its initial burden to show a lack of injury and causation, they responded with sufficient evidence on those issues to defeat summary judgment.

Plaintiffs' opposition relied heavily on deposition testimony from Salah, Ezeokoli and Slomovic that (1) they were working more, but earning less, than before Uber became a competitor for ride services; (2) they suffered injury to their business goodwill; and (3) these changes were due to Uber's false advertising.[1] In addition, plaintiffs submitted an expert report from economist Leslie Shafer, Ph.D., that proposed a methodology for estimating their damages based on data "that was known to be available or . . . likely to be available" after anticipated surveys were performed, data was collected, an econometric model was developed, and appropriate variables were identified. Survey data regarding consumer deception was to be provided at some future date.

Alternatively, plaintiffs argued that *Merck Eprova AG v. Gnosis S.p.A.* (2d Cir. 2013) 760 F.3d 247 (*Merck*) and related cases provided a presumption of injury and causation when direct competitors make deliberately false comparative statements. Plaintiffs argued this presumption applied to their claims, and relieved them of the need to prove causation and harm because Uber's summary judgment motion did not contest their status as competitors or their allegations of false advertising.

---

[1] Plaintiffs subsequently abandoned their claims of harm to their businesses as taxi owners and now apparently seek redress only for alleged lost income in their work as taxi drivers.

III. The Trial Court's Ruling

The trial court disagreed. It found that (1) Uber met its burden of showing a prima facie absence of evidence regarding causation; and (2) plaintiffs failed to respond with admissible evidence that any injury they suffered was caused by the alleged misrepresentations or that the presumption of harm and causation should apply.

The court found plaintiffs' deposition testimony inadmissible "insofar as the Plaintiffs offer answers asserting that Defendants' misstatements caused Plaintiffs to lose business. Plaintiffs' deposition transcripts uniformly offer no foundation for Plaintiffs' belief that it was Uber's false statements, rather than the new competition Uber brought to the market, that caused Plaintiffs' taxi business to decline." The court also sustained hearsay objections to news articles plaintiffs offered as evidence of a number of the alleged misleading statements. "Although the statements of Uber representatives quoted in the stories might qualify as party admissions, the statements by the authors of the articles themselves are not subject to any hearsay exception and are not adopted or authenticated by their authors."

Next, the court found Uber established a prima facie showing of absence of causation through evidence, also offered in its opposition to plaintiffs' contemporaneous motion for class certification, "that few to no passengers even saw the misrepresentations at issue and that they therefore cannot have caused Plaintiffs' injuries."

When it considered plaintiffs' rebuttal evidence, the court found their "very limited testimony regarding the causation of their injuries is speculative. Although Plaintiffs are competent to testify to the fact that the number of passengers they picked up declined after Uber entered the market, Plaintiffs offer no foundation for how they know that those passengers are

4

leaving because of Uber's false advertisements. In short, Plaintiffs offer no reason to believe that their loss of business is the result of false statements, rather than mere competition."

The court also rejected plaintiffs' reliance on the presumption of injury and causation. First, plaintiffs alleged only two instances of false advertising that directly compared Uber to the taxi industry. The court explained, "Plaintiffs do not show evidence that Uber made actionable comparative statements in the context of advertising. 'Statements made to the media and published in a journalist's news article concerning a matter of public importance are not commercial speech and are protected under the First Amendment.'" One of the two direct comparisons was a statement by Lane Kasselman, Uber's Head of Communications for the Americas, to a local news affiliate that Uber was " 'confident that every ride on the Uber platform is safer than a taxi.'" The court found that plaintiffs failed to offer evidence that Kasselman actually made the statement, or that it was "made as part of a coordinated advertising campaign or with the intent to influence consumer opinion."

The court then turned to the second comparative statement that allegedly caused plaintiffs to lose business, Kasselman's comment in a blog post that "[u]nlike the taxi industry, [Uber's] background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver." Here, too, the court found plaintiffs offered "no evidence that th[is] statement was made."

Finally, the court found that the presumption of injury and causation could not be based on implied, rather than express, comparisons to taxis, such as statements that Uber offered the " 'safest rides on the road'" and " 'always the safest experience,'" employed " 'an industry leading background

5

check process,' " and " 'thoroughly screened' " its drivers " 'through a rigorous process we've developed using industry-leading standards.' "  The court explained the presumption can apply to such statements, which merely imply a comparison to another product, only where "a typical consumer would nevertheless know who was being referenced," such as in a " 'two-player market.' "  Here, the evidence showed that Uber "exists in a complex market for personal transportation, and taxis are not its only, or even its primary, competitor" so any business gained by Uber did not necessarily mean lost business for taxi drivers.  Accordingly, the presumption did not apply to relieve plaintiffs of their burden to show causation and injury.

The trial court granted summary judgment and entered judgment in favor of Uber.  Plaintiffs' motion for class certification was dropped as moot.  This timely appeal followed.

## DISCUSSION

### I.   Summary Judgment Standards

" 'To secure summary judgment, a moving defendant may prove an affirmative defense, disprove at least one essential element of the plaintiff's cause of action [citations] or show that an element of the cause of action cannot be established [citations].  [Citation.]  The defendant "must show that under no possible hypothesis within the reasonable purview of the allegations of the complaint is there a material question of fact which requires examination by trial."  [Citation.]  [¶] The moving defendant bears the burden of proving the absence of any triable issue of material fact, even though the burden of proof as to a particular issue may be on the plaintiff at trial.  [Citation.]  . . . Once the moving party has met its burden, the opposing party bears the burden of presenting evidence that there is any triable issue

6

of fact as to any essential element of a cause of action.' " (*Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1485 (*Ochoa*).)

"In reviewing the propriety of a summary judgment, the appellate court must resolve all doubts in favor of the party opposing the judgment. [Citation.] The reviewing court conducts a de novo examination to see whether there are any genuine issues of material fact or whether the moving party is entitled to summary judgment as a matter of law." (*M.B. v. City of San Diego* (1991) 233 Cal.App.3d 699, 703−704.) "We accept as true the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them. [Citation.] However, to defeat the motion for summary judgment, the plaintiff must show ' "specific facts," ' and cannot rely upon the allegations of the pleadings." (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 805.) "While '[s]ummary judgment is a drastic procedure, should be used with caution [citation] and should be granted only if there is no issue of triable fact' [citation], it is also true '[j]ustice requires that a defendant be as much entitled to be rid of an unmeritorious lawsuit as a plaintiff is entitled to maintain a good one.' [Citation.] 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' " (*M.B. v. City of San Diego, supra*, at p. 704.)

"[I]t is well settled that on appeal following summary judgment the trial court's reasoning is irrelevant, and the matter is reviewed on appeal de novo. [Citations.] We exercise our independent judgment as to the legal effect of the undisputed facts [citation] and must affirm on any ground supported by the record." (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140.)

II.    <u>False Advertising under the Lanham Act</u>

Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) creates liability for false advertising or promotion that misrepresents the nature, characteristics, qualities, or geographic origin of goods, services, or commercial activities (15 U.S.C. § 1125(a)(1)(B)).[2]

" 'The elements of a Lanham Act § 43(a) false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.' " (*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 347–348.)

III.    <u>Analysis</u>

It is the fifth element of section 43(a) liability that concerns us here. "To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's

---

[2] "(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which— ¶ . . . (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act." (15 U.S.C. § 1125(a)(1).)

misrepresentations." (*Lexmark Int'l., Inc. v Static Control Components, Inc.* (2014) 572 U.S. 118, 140 (*Lexmark*).) To do so, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." (*Id*. p. 133.)

Here, Uber satisfied its initial burden with evidence showing plaintiffs could not establish the alleged false advertising caused them to lose riders. According to a report by Uber's finance, accounting and business valuation expert Terry Lloyd, "there are too many 'moving parts' in the ride-for-hire market and trying to isolate the effect of just one of them is simply not possible. The multitude of simultaneous independent variables are what statisticians refer to as 'confounding factors.'" Plaintiffs' theory of causation, Lloyd pointed out, merely assumed without any factual basis that "former taxi riders switched to Uber simply because of the disputed statements." To the contrary, a survey that even plaintiffs' expert relied on found that riders chose Uber over taxis and other modes of transportation for a variety of reasons, including safety, comfort, ease of use and payment, time savings, and reliability.

Observing that plaintiffs' proposed models for establishing damages failed to account for all the reasons people choose one kind of transportation over another, Lloyd opined that to conclude "a quantifiable amount of money earned by Uber from 2012 to 2017 in the affected jurisdictions was diverted from the putative classes as a result of Uber's allegedly false statements is simplistic and contrary to facts and common sense. It's like saying that Big Band artists should be able to sue Elvis Presley and Chuck Berry for lost record sales after rock-and-roll displaced 1940's pop music. While some

9

consumers stayed with the old genre most others migrated for different reasons."[3]

Dr. Maronick, the expert whom plaintiffs asserted was to provide survey evidence of actual consumer deception had yet to provide evidence of anything. As Uber observed, "[a] promise of evidence isn't evidence." Moreover, Maronick failed to explain how his survey design would eventually assess the impact of the alleged misrepresentations on potential riders and distinguish it from other reasons riders might choose one mode of transportation over another. Uber also adduced expert evidence that only a small percentage of riders saw the category of alleged misstatements related to the safety of its service.

Focusing on this latter point, plaintiffs mistakenly suggest that Uber's showing on the lack of proximate cause pertained solely to the safety-related comments, and disregarded the alleged false advertising that concerned the availability and proximity of rides, the legality of Uber's airport operations, and gratuities. True, Uber's expert analysis of viewer "hits" was limited in scope to the safety-related statements. However, Lloyd's analysis that plaintiffs were unable to separate out the impacts of the alleged false

---

[3] As observed in a different legal context, "[j]ust as some people prefer cats to dogs, some people prefer Uber to Yellow Cab, Flash Cab, Checker Cab, *et al.* They prefer one business model to another." (*Il. Transp. Trade Association v. City of Chicago* (7th Cir. 2016) 839 F.3d 594, 598.) Judge Posner identified a number of factors that might account for such preferences, such as "the storage of payment information, so that one does not need to be carrying cash or a credit card; the ability to see a time estimate of how long a pickup will take and also a driver's rating by past users; and the ability to request a ride from wherever one is (*e.g.,* from the comfort of home, inside during the rain rather than by hailing on a street). (*Id.* at p. 596.)

statements from the effect of multiple other factors pertained to each of the four groups of alleged false advertising.

Plaintiffs also argue the court erred in relying on Uber's expert evidence that few potential riders actually saw the challenged statements because that point was not raised in Uber's motion or separate statement of undisputed facts. Not so. Uber made the point in its summary judgment memorandum, albeit briefly, and referred to a fuller discussion and supporting evidence provided in its opposition to class certification filed the same day. Although plaintiffs were thus on notice, plaintiffs failed to object that the relevant evidence was not included in Uber's separate statement. "Whether to consider evidence not referenced in the moving party's separate statement rests with the sound discretion of the trial court, and we review the decision to consider or not consider this evidence for an abuse of that discretion." (*San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 315–316; Code Civ. Proc., § 437c, subd. (b) [failure to comply with separate statement requirement "may *in the court's discretion*" constitute sufficient ground to deny motion (italics added)]; but see *United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 337.) Here, plaintiffs were on fair notice of the omission but raised no objection. The court's consideration of the evidence was not an abuse of discretion.

Plaintiffs alternatively argue that, if Uber established a prima facie lack of causation, they responded sufficiently to defeat summary judgment "via direct evidence in the form of their Plaintiffs' testimony, expert testimony, and the presumption of causation that arises where the defendant makes false comparative statements." We agree with the trial court that plaintiffs' evidence was insufficient to show the existence of a triable issue of material fact.

11

As noted, the court excluded  plaintiffs' deposition testimony on causation because it was lacking foundation and too speculative.  We agree.  Asked how he thought Uber's conduct had harmed him, plaintiff Slomovic said Uber has "an unfair advantage" because it operates "essentially illegally with very little, if any, oversight."  But he conceded he did not know *why* a consumer will choose Uber over a taxi ("I have no way of reading somebody else's mind"), except that it seemed "inevitable" based on unidentified data and analyses that "Uber is the main cause and that misrepresentation by Uber to passengers and regulator is the reason why those opinions happen and why people think the way they do."

The other two plaintiffs' testimony on causation was equally speculative.  Salah testified he knew the challenged statements caused him losses "from my— from what happened with other drivers and what happened to other businesses, taxi business industry" and because "it's all out there to the public and everybody is reading it."  When Ezeokoli was asked how he could measure the effect of Uber's false advertising on his business, he responded, "the way I can say is that, you know, my income is dropping, and that's a way, telling me that something is really not going right"  and "I just know it's because of Uber."  And he conceded he did not know why passengers would pass up cabs at airports in favor of Uber.

"A triable issue of material fact may not be created by speculation or a 'stream of conjecture and surmise' "  (*Miller v. Fortune Commercial Corp.* (2017) 15 Cal.App.5th 214, 220.)  Summary judgment may be affirmed where the plaintiff's evidence is little more than guesswork " ' "in the realm of mere speculation and conjecture." ' "  (*Wiz Technology, Inc. v. Coopers & Lybrand* (2003) 106 Cal.App.4th 1, 15].)  The trial court properly found plaintiffs' testimony failed to establish the existence of a material issue as to causation.

Taking a different tack, plaintiffs contend their testimony that they "believed" Uber's misrepresentations caused them to lose riders was legally sufficient proof of causation. They observe the Lanham Act expressly authorizes suit by a person who "who *believes* that he or she is likely to be damaged" (15 U.S.C. § 1125(a) (italics added) by false advertising.[4] Accordingly, they contend, to defeat summary judgment they were only required to supply evidence that they *believed* Uber's advertising caused them harm—not that it actually did so. Here, too, they are mistaken. As the Supreme Court made clear in *Lexmark,* the Lanham Act incorporates a requirement of proximate causation "its broad language notwithstanding."[5] (*Lexmark*, *supra*, 572 U.S. at p. 132.) "While the statute gives the right to sue to a person who 'believes that he is or will be damaged,' it is clear that to prevail in such a suit or even, if there is a question, to establish his standing,

---

[4] Under section 1125(a)(1), "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—[¶] (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or [¶] (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, [¶] shall be liable in a civil action *by any person who believes* that he or she is or is likely to be damaged by such act. (Italics added.)

[5] *Lexmark* is primarily addressed to Article III *standing* to bring a Lanham Act claim. While standing and proximate cause are closely related in this context, they are not interchangeable constructs. (See *Lexmark* at pp. 129, 134 fn. 6 ["Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct"].)

there must be a real possibility of his being damaged and not the mere assertion of a belief." (*D.M. & Antique Import Corp. v. Royal Saxe Corp.* (S.D.N.Y. 1969) 311 F.Supp. 1261, 1269 fn. 6; *Chromium Industries, Inc. v. Mirror Polishing & Plating Co., Inc.* (N.D. Ill. 1978) 448 F.Supp. 544, 554.)

Plaintiffs' reliance on the principle that parties are generally competent to testify to losses in value of their own property or business (see, e.g., *Newhart v. Pierce* (1967) 254 Cal.App.2d 783, 789) does not solve their problem. While true as far as it goes, this principle has no bearing on whether plaintiffs' losses were *caused* by the challenged statements.

Plaintiffs also propose they satisfied their burden through evidence from their expert economist. Dr. Schafer's report described the market of regulated passenger transportation providers and proposed "a regression analysis which permitted calculating how much of the taxi[] industry's loss . . . was attributable to Uber exclusively (factoring out all other competitors' impact)." This, they assert, "when viewed with the uncontested allegations that Uber made false statements about its competitors, was sufficient" to trigger the presumption of causation and thus defeat summary judgment.

Not so. At most, Dr. Schafer's proposed analysis would show losses attributable to competition from Uber generally, not to those losses caused by the challenged advertising. Dr. Schafer expressly acknowledged the limits of her proposed work: "[o]nce the baseline of Uber's impact on taxi service is established, the next step is to identify the share of that impact associated with each of the four [categories of] false representations in Los Angeles." She did not claim to be able to measure that impact. Instead, she intended to rely on the anticipated results of another expert's survey that had yet to be undertaken.

14

Once the burden shifts to the party opposing summary judgment, "[i]t is not enough to produce just some evidence. The evidence must be of sufficient quality to allow the trier of fact to find the underlying fact in favor of the party opposing the motion for summary judgment." (*McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098, 1105.) Dr. Schafer's proposed study is plainly not "adequate . . . for a reasonable jury to conclude that Plaintiffs suffered actual injury as a result of Defendants' advertisements." (*Southland Sod Farms v. Stover Seed Co.* (9th Cir. 1997) 108 F.3d 1134, 1146 (*Southland Sod*); see also *Lindy Pen Co., Inc. v. Bic Pen Corp.* (9th Cir. 1993) 982 F.2d 1400, 1411 (*Lindy Pen*) [plaintiff in trademark infringement action offered " 'credible proof of the fact of damage' " based on evidence a wholesale distributor switched products].)

Alternatively, plaintiffs argue they are not required to show a factual dispute over injury or causation because those elements are presumed under the Lanham Act when deliberately false statements are made by a competitor. "Since Uber did not contest the falsity of its statements," they maintain, "it has failed to negate the presumption of causation [and] injury." We disagree. As the trial court found, plaintiffs failed to show the presumption applies here.

*Merck*, *supra*, 760 F.3d 247, discusses the relevant principles. "In *McNeilab, Inc. v. American Home Prods. Corp.*, 848 F.2d 34, 38 (1988) we distinguished two types of false advertising cases and the presumptions they permit: (1) 'misleading, non-comparative commercials which touted the benefits of the products advertised but made no direct reference to any competitor's product,' and (2) 'a false comparative advertising claim.' We noted that '[a] misleading comparison to a *specific competing product* necessarily diminishes that product's value in the minds of the

15

consumer.' [Citation.] In the first type of case (i.e., non-comparative advertising), the injury 'accrues equally to all competitors; none is more likely to suffer from the offending broadcasts than any other.' [Citation.] In those types of cases, 'some indication of actual injury and causation' would be necessary in order to ensure that a plaintiff's injury is not speculative." (*Merck* at p. 259; *Harper House, Inc. v. Thomas Nelson* (9th Cir. 1989) 889 F.2d 197, 209-210 [rebuttable presumption does not apply where defendant misrepresents its own product without targeting any other specific product]; see *Balance Dynamics Corp. v. Schmitt Industries, Inc.* (6th Cir. 2000) 204 F.3d 683, 694-695 (*Balance Dynamics*); *Porous Media Corp. v. Pall Corp.* (8th Cir. 1997) 110 F.3d 1329, 1335 (*Porous*); but see *ThermoLife Intern., LLC v. Gaspari Nutrition Inc.* (9th Cir. 2016) 648 Fed.Appx. 609, 615−616 [unpublished memorandum opinion].)

In contrast, where a defendant falsely compares its product to a competitor's, "injury may be presumed, because there was not the same concern of awarding damages for merely speculative injury." (*Merck*, *supra*, 760 F.3d at p. 259.) The "classic instance of comparative advertising" is "where one company's advertisement mentions a competitor's product by name" (*id*. at p. 261), but the presumption also applies where, although the comparison to a competing product is not express, the configuration of the relevant market is such that the defendant's gain necessarily comes at the plaintiffs' expense. This is so because, in such situations, the "utilization of a presumption of injury carries no risk of speculative injury." (*Id*. at p. 259−261 [presumption applies in two-player markets; *Time Warner Cable, Inc. v. DIRECTV, Inc.,* (2d Cir. 2007) 497 F.3d 144, 162-163 (*Time Warner*) [satellite television provider falsely advertised its service was better than

16

"cable;" the presumption applied because the plaintiff was the *sole* provider of cable in the relevant market].)

Here, plaintiffs assert the presumption applies because Uber made false statements that, without referring to taxis, *implied* that Uber rides are safer than cabs. Such implied comparisons include statements that Uber offered "the safest rides on the road" and "always the safest experience," employed "an industry-leading background check process," and screened every driver "using industry-leading standards."[6] Plaintiffs provided no admissible evidence showing the presumption applies to these implied comparisons. To the contrary, Uber's expert evidence established that the parties compete in a complex market for personal transportation with multiple competitors that include personal transportation services such as Lyft, ZipCar, public transportation, and private shuttles. The court properly distinguished this situation from those in *Merck* and *Time Warner,* where any business the defendant gained from its false advertising necessarily meant a loss of business for the plaintiff.

Plaintiffs urge that the presumption extends broadly beyond the boundaries described in *Merck* and *Time Warner* to any situation involving false statements by competitors, but the authorities they cite do not support

---

[6] The complaint also alleged numerous instances of false advertising regarding airport pickups, the proximity of rides, and tipping, but those statements cannot reasonably be construed as implied comparisons to the taxi industry. "[W]here a defendant is guilty of misrepresenting its own product without targeting any other specific product, it is erroneous to apply a rebuttable presumption of harm in favor of a competitor. Otherwise, a plaintiff might enjoy a windfall from a speculative award of damages by simply being a competitor in the same market." (*Porous*, *supra*, 110 F.3 at p. 1334.) Our discussion of implied comparisons is therefore limited to Uber's safety-related statements.

such a broad application.  In *TrafficSchool.com, Inc. v. EDriver Inc.* (9th Cir. 2011) 653 F.3d 820 (*TrafficSchool*), the plaintiffs  introduced "ample" evidence that "sales gained by one [were] . . . likely to come at the other's expense."  The Ninth Circuit held this was sufficient proof of injury-in-fact to establish plaintiffs' Article III standing to enjoin the defendant's false advertising under the Lanham Act.  (*TrafficSchool* at p. 825.)  Such "[e]vidence of direct competition is strong proof that plaintiffs have a stake in the outcome of the suit, so their injury isn't 'conjectural' or 'hypothetical.' " (*Id*. at pp. 825−826.)  Even so, the plaintiffs were not entitled to recover lost profits because they produced no proof of past injury or causation and the challenged advertising did not expressly compare the competitors' products. (*Id*. at p. 831.)

Plaintiffs' other authorities are also unpersuasive here.  In *Southland Sod*, *supra*, 108 F.3d at p.1146, the defendant expressly claimed its product performed better than the plaintiffs', and, in any event, the plaintiffs opposed summary judgment with evidence sufficient for a jury to find they were in fact harmed by the defendants' advertisements.  In *U-Haul Intern., Inc. v. Jartran, Inc.* (9th Cir. 1986) 793 F.2d 1034, 1036, 1040−1041, the challenged advertising explicitly compared Jartran to U-Haul.  *Lindy Pen*, *supra*, 982 F.2d 1400, concerns trademark infringement claims, not false advertising, and the plaintiff provided "credible proof" that it was harmed by the infringing conduct.  (*Id*. at p. 1411.)  None of these decisions apply the Lanham Act presumption of causation to implied comparisons beyond the boundaries discussed in *Merck* and *Time Warner*.

What, then, of the alleged deceptive statements that *expressly* compare Uber to taxis?  Our review confirms the trial court's determination that the complaint alleged only two such statements: Kasselman's statement to a

journalist that "every ride on the Uber platform is safer than a taxi," and his comment in a blog post that Uber's background checking was more consistent and often more rigorous than the taxi industry's.[7] But Uber's evidentiary showing that plaintiffs cannot demonstrate those statements caused them to lose ridership rebutted any presumption of harm that could have arisen from them. (See *Balance Dynamics*, *supra*, 204 F.3d at pp 694–695.)

Moreover, as the court found, plaintiffs failed to offer evidence that either statement was actually made. "[A] party cannot rely on the allegations of his own pleadings, even if verified, to make or supplement the evidentiary showing required in the summary judgment context. [Citations.] The basic purpose of summary judgment is to provide a means by which the court determines whether 'the triable issues apparently raised by [the complaint and answer] are real or merely the product of adept pleading.' [Citation.] Hence, the moving party must demonstrate the presence or absence of a genuine triable issue by 'affidavit' or other competent means." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 720, fn. 7.) Plaintiffs did not do so.[8]

The trial court got it right. Uber established a prima facie case that plaintiffs could not prove the alleged false statements caused them harm. Plaintiffs, in response, failed to offer evidence of actual causation or show the Lanham Act's presumption of causation should be applied in this case. Summary judgment was properly granted.

_____

[7] For this reason, we need not also address whether, as plaintiffs assert, the trial court erred when it sustained multiple hearsay objections to evidence of a number of unalleged impliedly comparative statements.

[8] A plaintiffs' expert's analysis of plaintiffs' *allegations* about the various challenged statements does not compensate for their failure to produce evidence authenticating the alleged statements.

## DISPOSITION

The judgment is affirmed.

_____

Siggins, P.J.


WE CONCUR:



_____

Fujisake, J.



_____

Jackson, J.


*Ezeokoli v. Uber* A156445