20-3049
USA v. Gibson

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2021

(Argued:  November 23, 2021                    Decided: December 6, 2022)

Docket No. 20-3049

_____

UNITED STATES OF AMERICA,

*Appellant*,

- v. -

VINCENT GIBSON,

*Defendant-Appellee.*
_____

Before:  KEARSE, LOHIER, and LEE, *Circuit Judges*.

Appeal by the United States from so much of a judgment entered in the United States District Court for the Western District of New York, Lawrence J. Vilardo, *Judge*, as sentenced defendant Vincent Gibson to 60 months' imprisonment following his plea of guilty to five counts of bank robbery in violation of 18 U.S.C. § 2113(a), five counts of entering the banks with intent to commit larceny in violation of 18 U.S.C. § 2113(a), one count of bank larceny in violation of 18 U.S.C. § 2113(b), and one count of interstate communication of a threat to injure in violation of 18 U.S.C. § 875(c). The district court declined to sentence Gibson as a career offender under Sentencing Guidelines § 4B1.1 to a recommended imprisonment range of 151 to 188 months, ruling that a predicate advanced by the government for the enhancement--Gibson's 2002 conviction of third-degree attempted criminal sale of a controlled substance under New York Penal Law §§ 220.39(1) and 110--was not a proper predicate because New York's controlled substances schedule included naloxegol, which was removed from the federal controlled substances schedules promulgated under the Controlled Substances Act, 21 U.S.C. §§ 801-971, in 2015. The court ruled that as the New York schedule was broader than the current federal schedules--*i.e.*, those reflecting federal criminal law as it stood at the time of Gibson's sentencing in the present case--Gibson's conviction under §§ 220.39(1) and 110 is not

2

a "controlled substance offense" within the meaning of § 4B1.1. On appeal, the government, which bypassed its opportunities in the district court to argue that the New York schedule was not broader than the current federal schedules, contends that the district court misinterpreted the Guidelines by failing to compare the New York schedule to the federal schedules as they existed at the time of Gibson's state-law conviction in 2002. Finding no merit in that contention, we affirm. While there is much to be said for looking to federal criminal law as it stood at the time the defendant engaged in the conduct that constitutes his present offense, rather than at the time of sentencing for his present offense, we need not decide between the two in this case because either leads to affirmance. Federal criminal law--both at the time of this conduct and at the time of sentencing for it--was narrower than the state law that governed Gibson's 2002 conviction.

Affirmed.

KATHERINE A. GREGORY, Assistant United States Attorney, Buffalo, New York (James P. Kennedy, Jr., United States Attorney for the Western District of New York, Buffalo, New York, on the brief), *for Appellant*.

MARIANNE MARIANO, Federal Public Defender, Buffalo, New York, *for Defendant-Appellee*.

3

KEARSE, *Circuit Judge*:

The United States appeals from so much of a judgment of the United States District Court for the Western District of New York, Lawrence J. Vilardo, *Judge*, as sentenced defendant Vincent Gibson to 60 months' imprisonment following his plea of guilty to 11 crimes committed in 2017, to wit, five counts of bank robbery in violation of 18 U.S.C. § 2113(a), five counts of entering the banks with intent to commit larceny in violation of 18 U.S.C. § 2113(a), and one count of bank larceny in violation of 18 U.S.C. § 2113(b); and one count of interstate communication of a threat to injure in violation of 18 U.S.C. § 875(c) in 2018. The government had urged the court to sentence Gibson as a career offender under § 4B1.1 of the advisory Sentencing Guidelines ("Guidelines"), within the recommended imprisonment range of 151 to 188 months. The court rejected that request, ruling that one of the predicates advanced by the government for such an enhancement--Gibson's 2002 conviction of third-degree attempted criminal sale of a controlled substance under New York Penal Law §§ 220.39(1) and 110--is not a proper predicate because New York's controlled substances schedule included naloxegol, which had been removed from the federal controlled substances schedules, promulgated under the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801-971, in 2015. The court ruled that "controlled substances"

4

in § 4B1.1 refers exclusively to substances controlled under the CSA, and that as the New York schedule was broader than the schedules currently promulgated under the CSA--*i.e.*, those reflecting federal criminal law as it stood at the time of Gibson's sentencing in the present case--Gibson's conviction under §§ 220.39(1) and 110 is not a controlled substance offense within the meaning of § 4B1.1. On appeal, the government, which bypassed its opportunities in the district court to argue that New York law was not broader than the current federal law, contends that the district court misinterpreted the Guidelines by failing to compare the New York controlled substances schedule to the federal schedules as they existed at the time of Gibson's state-law conviction in 2002. Finding no merit in that contention, we affirm. While there is much to be said for looking to federal criminal law as it stood at the time the defendant engaged in the conduct that constitutes his present offense, rather than at the time of sentencing for his present offense, we need not decide between the two in this case because either leads to affirmance. Federal criminal law--both at the time of this conduct and at the time of sentencing for it--was narrower than the state law that governed Gibson's 2002 conviction.

I. BACKGROUND

The factual background is not in dispute. As indicated above, Gibson has been convicted in the present case, pursuant to his plea of guilty, of committing, *inter alia*, several felony crimes of violence in 2017, *see, e.g., United States v. Moore*, 916 F.3d 231, 237 (2d Cir. 2019) (bank robbery "by force and violence, or by intimidation," 18 U.S.C. § 2113(a), is a felony crime of violence). Gibson's past criminal record includes his 2002 felony conviction of third-degree attempted criminal sale of a controlled substance in violation of New York Penal Law §§ 220.39(1) (third-degree sale) and 110 (attempt) (collectively "N.Y. §§ 220.39(1) and 110"), and a 2004 felony conviction of first-degree attempted robbery in violation of New York Penal Law §§ 160.15(2) and 110.

A. *The Dispute Over the Controlled Substance Predicate for Career-Offender Enhancement*

To the extent relevant here, Guidelines § 4B1.1 provides that a defendant whose current offense is a crime of violence, committed when he was over 18 years of age, "is a career offender if . . . [he] has at least two prior felony convictions of either a crime of violence or a controlled substance offense." Guidelines § 4B1.1(a). Those

"two" predicate convictions can consist either of convictions in the same category or of "one felony conviction of a crime of violence and one felony conviction of a controlled substance offense." *Id*. § 4B1.2(c). As defined in pertinent part by the Guidelines,

> [t]he term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the . . . dispensing of a controlled substance,

Guidelines § 4B1.2(b), or an attempt to commit such an offense, *see id*. Application Note 1.

Under New York law, "[a] person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells . . . a narcotic drug," N.Y. Penal Law § 220.39(1) (McKinney 2002)--or of an attempt to do so, *see id*. § 110. The term "narcotic drug" is defined to include "any controlled substance"-- other than methadone--"listed in schedule . . . II(b)" of § 3306 of New York's Public Health Law. N.Y. Penal Law § 220.00(7) (McKinney 2002). As relevant here, that schedule II(b) list of controlled substances includes--as it apparently did in 2002-- "[o]pium and opiate, and *any* salt, compound, *derivative*, or preparation *of opium or opiate*." N.Y. Pub. Health Law § 3306 Schedule II(b)(1) (McKinney 2002) ("New York schedule II(b)(1)") (emphases added). Naloxegol is an opium alkaloid derivative. *See*

7

*generally* Schedules of Controlled Substances: Removal of Naloxegol From Control, 80 Fed. Reg. 3468, 3468 (Jan. 23, 2015) ("Naloxegol Delisting Rule") ("Prior to the effective date of this rule, naloxegol was a schedule II controlled substance because it can be derived from opium alkaloids.").

The government, in anticipation of Gibson's plea of guilty in the present case (without a plea agreement), submitted to the court a Calculation of Maximum Sentence and Sentencing Guideline Range. It contended that Gibson's record of convictions subjected him to the Guidelines § 4B1.1 career-offender enhancement. The application of that enhancement increases a defendant's Guidelines offense level and criminal history category and would have resulted in a recommended imprisonment range for Gibson of 151 to 188 months.

Gibson, in response, filed a motion asking the court not to apply the career-offender enhancement, contending that the necessary predicates were lacking. While noting that New York attempted robbery had been held by this Court to be a crime of violence, he argued that his 2002 controlled substance conviction under N.Y. §§ 220.39(1) and 110 was not a proper predicate because naloxegol, a narcotic drug criminalized by § 220.39(1) and New York schedule II(b)(1), has been excluded from federally controlled substances since 2015. (*See* Gibson Memorandum of Law dated

8

October 31, 2019 ("October Mem."), at 2-5.) Gibson pointed out that in *United States v. Townsend*, 897 F.3d 66 (2d Cir. 2018) ("*Townsend*"), this Court held that "the term 'controlled substance' in § 4B1.2(b) refers exclusively to substances scheduled under the [CSA]"; that New York Penal Law § 220.31 (fifth-degree criminal sale of a controlled substance) encompassed Human Chorionic Gonadotropin ("HCG"), a drug that was not included in the federal schedules; that § 220.31 was therefore broader than federal law; and that a conviction under § 220.31 was thus not a "controlled substance" offense within the meaning of § 4B1.1. (Gibson October Mem. at 2, 4 (citing *Townsend*, 897 F.3d at 75).) Gibson argued that the reasoning of *Townsend* applied equally to his conviction under N.Y. §§ 220.39(1) and 110. He contended that the district court should "look to the Guidelines and the state-of-the-law as it exists . . . . 'on the date the defendant is sentenced'" to determine what § 4B1.1's reference to a controlled substance offense means with respect to the defendant to be federally sentenced (*id*. at 5 (quoting 18 U.S.C. § 3553(a)(4)(A)(ii)); and that the court should conclude that a conviction under N.Y. §§ 220.39(1) and 110 is not a controlled substance conviction within the meaning of § 4B1.1 because of New York schedule II(b)(1)'s criminalization of naloxegol, which has not been a federally controlled

9

substance since 2015. Gibson argued that with only one possible predicate conviction remaining--the 2004 attempted robbery conviction--§ 4B1.1 was not applicable.

The government, while not disputing Gibson's contention that N.Y. §§ 220.39(1) and 110 included naloxegol and thus criminalized a broader range of conduct than do the current CSA schedules, argued that the district court should reject Gibson's advocated "time-of-sentencing" rule for comparing a state law to its generic federal counterpart. (Government's Response in Opposition to Defendant's Memorandum of Law, dated December 2, 2019 ("Government's December 2 Mem."), at 4.) The government stated that "[i]n *Townsend*, the Court specifically compared the state and federal controlled substance schedules *at the time of Townsend's conviction*, not the schedules at the time of his sentencing. 897 F.3d at 74." (Government's December 2 Mem. at 5 (emphasis in Mem.).) It also contended that this Court had used that same retrospective focus in *Doe v. Sessions*, 886 F.3d 203, 208 (2d Cir. 2018), albeit with respect to an immigration removal proceeding. The government contended that the district court should look to the contents of the CSA schedules only as of the time of Gibson's 2002 conviction under §§ 220.39(1) and 110; and as naloxegol had been a federally prohibited controlled substance at that time (*see* Government's December 2 Mem. at 5 ("New York schedule of substances in 2002

10

correlates with the CSA schedules in place in 2002")), the court should conclude that that conviction was a proper predicate for the career-offender enhancement (*see id.* at 5-6).

B. *The Decisions of the District Court*

After hearing oral argument on Gibson's motion to preclude application of § 4B1.1, the district court stated that it would "apply[] the current [CSA] law." (Motion Hearing Transcript January 31, 2020 ("H.Tr."), at 9.)  And as the 2020 CSA schedules did not make naloxegol a controlled substance, the New York schedules including that substance were broader than the current federal law.  The court concluded that, under *Townsend*, Gibson's 2002 state-law controlled substance conviction was not a permissible predicate for a § 4B1.1 career-offender enhancement.

In the wake of the court's ruling that it would not apply the § 4B1.1 career-offender enhancement, the Probation Office calculated that Gibson's total offense level and his criminal history without that enhancement would result in a recommended imprisonment range of 92 to 115 months.  Gibson thereafter sought a below-Guidelines sentence of 60 months' imprisonment.  The government, citing the need for deterrence, the nature of Gibson's crimes, and the need to protect the public

11

from his offenses, argued for an above-Guidelines sentence of 151 to 188 months (*i.e.*, the same range that would have been applicable under the career-offender enhancement).

At Gibson's sentencing hearing, the district court reiterated that it was rejecting the career-offender enhancement. (*See* Sentencing Transcript at 9.) It also concluded that lenient sentencing was warranted. The court found, *inter alia*, that Gibson's robberies and attempted robbery, in which he had given demanding notes to the bank tellers, involved no violence, no intended violence, nor even any thought of violence, as evidenced by the fact that when one teller simply refused to hand him any money, he promptly left the bank. (*See id*. at 30.) It also found that Gibson's only two prior offenses had been committed nearly two decades earlier; that his current offenses--confined to the length of a single month--had been "a discrete thing" when he was "trying to get money to feed [his] family"; and that the current robberies had "ended when [he] had enough money to feed [his] family, evidently, and [he] didn't continue with any criminal conduct at all in that intervening year before" he was arrested. (*Id*. at 30-32.) Having considered the sentencing factors under 18 U.S.C. § 3553(a), the court sentenced Gibson to a below-Guidelines prison term of 60 months for each of the 12 counts, all to be served concurrently.

The government timely appealed. It challenges only the district court's refusal to sentence Gibson as a career offender; it does not challenge any of the court's factual findings or contest the court's decision to impose a below-Guidelines sentence if career-offender status was inapplicable.

## II. DISCUSSION

We begin by noting that this appeal presents fewer issues than might have been raised with respect to the government's proffered predicates for the career-offender enhancement. First, Gibson did not challenge the use of his attempted first-degree robbery conviction as a predicate by raising (as he might have for issue-preservation purposes) the issue--then-percolating through the courts--of whether a robbery attempt can categorically be a "crime of violence," *see generally United States v. Taylor*, 142 S. Ct. 2015 (2022) (holding that Hobbs Act attempted robbery is not a crime of violence within the meaning of 18 U.S.C. § 924(c)(3)(A)).

Second, in response to Gibson's contention that his controlled substance conviction could not serve as a predicate because New York schedule II(b)(1) criminalized more substances than are currently criminalized by the federal

schedules, the government did not argue that the New York law was not broader than the current federal schedules.

The government's appeal presents a dispute over what version of the CSA schedules is to be compared against state law in connection with a proposed career-offender enhancement. The government advocates use of the version in effect at the time of Gibson's state-law controlled substance conviction; Gibson argues that the appropriate version is the one in effect at the time of sentencing in the present case. As between these two possibilities we think Gibson's view, adopted by the district court, is the more appropriate--although, as discussed hereafter, even the version in effect at the time of sentencing may not be the most appropriate.

A. *The Lack of Dispute as to the Current Existence of a Disparity*

The government argued that the district court should ignore the current federal schedules and look only to the CSA schedules as they existed at the time of Gibson's state-law controlled substance conviction in 2002, when, the government argues, the state and federal schedules were the same. That timing argument was the government's sole position when Gibson first argued that the career-offender enhancement could not be applied because the relevant New York schedules

14

criminalized more conduct than the current federal schedules; and the government did not alter its position when Gibson, in reply, pointed out that

> [t]he government does not seriously dispute the principal premise of Mr. Gibson's argument: That New York's definition of 'narcotic drug' encompasses substances not currently scheduled under federal law

(Gibson Reply Memorandum dated December 9, 2019, at 1).

At oral argument of Gibson's motion to preclude application of the career-offender enhancement, the district court began by noting that in order to determine the eligibility of a prior state conviction to serve as a federal sentencing enhancement predicate the court was required to compare the state and federal statutes using the "categorical approach":

> THE COURT: . . . . [Y]ou have to apply the categorical approach that you look at the statutes. And if the state statute under which the defendant was convicted criminalizes the possession of a certain substance that is not criminalized under the federal statute, then the state statute doesn't [ap]ply, right? Got that?
>
> MR. MOLISANI [Assistant United States Attorney]: Correct.

(H.Tr. 2.) The government thus agreed that the categorical approach was required; and it did not attempt to alter the court's explicitly stated understanding that in fact

15

"we've got a drug here that's criminalized under the state statute, but it's not under . . . . the federal schedule." (*Id*. at 2-3.)

The government's position was strictly that New York law should be compared only against the earlier version of the federal schedules. It stated that "something [wa]s removed from th[e federal] schedule well after the time that [Gibson] was convicted of th[e state] offense," but Gibson "was convicted at a time where [*sic*] the schedules were exactly the same." (H.Tr. 3.)

The district court, having noted at the outset the undisputed need for a categorical analysis as to whether the New York schedules were broader than the current federal schedules, having heard Gibson's argument for the affirmative, and having received no contrary argument from the government as to the divergence, resolved the issue. The categorical approach focuses on the generic nature of the federal offense and "not [on] the facts underlying the case"; the court must presume that the defendant's conviction "'rested upon [nothing] more than the least of th[e] acts' criminalized [under state law], and then determine whether even those acts are encompassed by the generic federal offense." *Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013) (quoting *Johnson v. United States*, 559 U.S. 133, 137 (2010)). The court here, without any indication that it resorted to consideration of the facts, expressly

16

"agree[d] with" Gibson's contention that "[§] 220.39 under the New York State statute is broader than the [current] federal statute." (H.Tr. 9.) Any suggestion by the government that the district court did not use the categorical approach in addressing the matter of whether there was a divergence between state law and current federal law is belied by the record.

The government admits that in the district court it "focused only on timing, and not whether the removal of naloxegol rendered the New York drug schedule categorically broader than the Controlled Substances Act." (Government's reply brief on appeal at 12.) But if, in also stating that "[t]he government does *not* concede that the schedules diverged" (*id*. at 11 (emphasis in original)) and that it did not "*expressly* [so] conced[e]" in the district court (*id*. (emphasis added)), the government seeks to suggest that the existence of disparate schedules is an unresolved issue that would be an impediment to affirmance, it is mistaken. While the government claims that "*the only issue the parties litigated* was whether the district court should have examined Gibson's prior conviction in light of the federal drug schedule in effect at that time, or using the version in effect more than a decade later" (*id*. at 12 (emphasis added)), the federal courts do not engage in piecemeal adjudication leading to a parade of final judgments in the same case. The district

17

court, in light of the issues presented and the arguments made by the parties--or in this case, forgone or unrefuted by the parties--resolved the entire case and entered final judgment.  The issue raised by Gibson's central contention--that the state and federal schedules diverged--did not remain unresolved by the government's refusal to address it.

The government is correct that it "is constrained from arguing on appeal that the drug schedules are comparable even after the 2015 amendment removing naloxegol," having made no such argument in the district court. (Government's reply brief on appeal at 12; *see also* Government's main brief on appeal at 11 ("That *the drug schedules diverged 13 years after Gibson's offense* has no bearing on whether the crime for which he was actually convicted was a controlled substance offense." (emphasis added)).) We turn to its preserved contention that the district court should consider federal law only as it existed at the time of a defendant's conviction under state law.

B. *The Government's Time-of-Prior-Conviction Contention*

In arguing that the district court, in determining the applicability of § 4B1.1 for enhancement of Gibson's sentence for his current federal offense, was required to compare New York's schedule II(b)(1) against the CSA schedules as they

18

stood at the time of his 2002 New York controlled substance conviction, rather than at the time of his sentencing for his present federal offenses, the government principally relies on *McNeill v. United States*, 563 U.S. 816 (2011), which involved a change of state law, not federal law, and on *Doe v. Sessions*, 886 F.3d 203 (2d Cir. 2018) ("*Doe*"), which involved immigration, not sentencing. It also proffers its own interpretation of our decision in *Townsend*. Reviewing the district court's Guidelines interpretations and legal rulings *de novo*, *see*, *e.g.*, *United States v. Flores*, 945 F.3d 687, 723 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 375 (2020), we reject the government's contentions.

1. *The Supreme Court's Decision in* McNeill

In support of its contention that the district court in interpreting "controlled substance offense" in § 4B1.1 was required to look to the CSA schedules only as they stood at the time of Gibson's 2002 controlled substance conviction under New York law, the government relies heavily on the Supreme Court's decision in *McNeill*, 563 U.S. 816, which considered a sentencing enhancement under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). Under ACCA, a person who is being sentenced for being a felon in unlawful possession of a firearm in violation of

19

18 U.S.C. § 922(g), and who "has three previous convictions . . . for . . . a serious drug offense, . . . committed on occasions different from one another," is subject to a minimum of 15 years' imprisonment. *Id*. § 924(e)(1). In *McNeill*, the relevant ACCA definition of a "serious drug offense" was "an offense under State law, involving . . . a controlled substance . . . for which a maximum term of imprisonment of ten years or more is prescribed by law." *Id*. § 924(e)(2)(A)(ii). McNeill had "six state drug-trafficking convictions" under North Carolina law for crimes "committed . . . between 1991 and 1994, each carr[ying] a 10-year maximum sentence, and McNeill in fact received 10-year sentences." *McNeill*, 563 U.S. at 818. When being sentenced in 2009 for his § 922(g) offense, he contended that those state convictions were not proper predicates for the ACCA enhancement because North Carolina had subsequently reduced the maximum sentence for selling cocaine to 38 months and the maximum for possessing cocaine with intent to sell to 30 months; thus, in 2009, the maximum imprisonment for those crimes was not 10 years or more. The Supreme Court rejected that argument, stating as follows:

> The plain text of ACCA requires a federal sentencing court to consult the maximum sentence applicable to a defendant's previous drug offense at the time of his conviction for that offense. The statute requires the court to determine whether a "previous convictio[n]" was for a serious drug offense. The only way to

answer this backward-looking question is to consult the law that applied at the time of that conviction.

*McNeill*, 563 U.S. at 820. Despite the fact that the statutory language defining a serious drug offense used the present tense--calling it one "for which a maximum term of imprisonment of ten years or more *is* prescribed by law," 18 U.S.C. § 924(e)(2)(A)(ii) (emphasis added)--the Court reasoned that one could not know what the maximum penalty was for the offense of which the defendant had been convicted without consulting the statute that was actually applied to him, *see* 563 U.S. at 823.

In the present case, the government argues that because the *McNeill* defendant's prior state conviction was the focus of a proposed recidivism-related sentencing enhancement, the present case is "[j]ust like . . . *McNeill*." (Government's reply brief on appeal at 3, 4.) The government points out that the Supreme Court stated that

> McNeill cannot explain why two defendants who violated § 922(g) on the same day and who had identical criminal histories--down to the dates on which they committed and were sentenced for their prior offenses--should receive dramatically different federal sentences solely because one's § 922(g) sentencing happened to occur after the *state* legislature amended the punishment for one of the shared prior offenses,

21

*McNeill*, 563 U.S. at 823 (emphasis added), and "[t]he government asks the same question here" (Government's reply brief on appeal at 5).

But the present case does not in fact involve "the same question." First, "[t]he question in [*McNeill*] concern[ed] how a federal court should determine *the maximum sentence* for a prior state drug offense for ACCA purposes," *McNeill*, 563 U.S. at 817 (emphasis added), where the change was one in state law, not, as here, a change of federal law. In *McNeill*, in holding that the district court was required to determine "the *maximum sentence applicable* to a defendant's previous drug offense at the time of his conviction *for that offense*," and concluding that the "only way" to do so was to "consult *the law that applied* at the time of that conviction," *id*. at 820 (emphases added), the Court's focus was indeed retrospective; but the focus was not on federal law but only on North Carolina law.

Thus, while the government asks us to rule that the district court here was required to look back to the contents of the CSA schedules at the time of Gibson's New York conviction, *McNeill* does not point us toward the CSA schedules at all, for federal law--whatever its content was in 2002--was not "the law that applied" to Gibson's drug offense because Gibson was not then prosecuted under federal law. Whether or not the CSA schedules in effect at that time were identical to the New

22

York schedules, nothing in federal law governed the "sentence applicable" to Gibson for his 2002 violation of N.Y. §§ 220.39(1) and 110.

Second, *McNeill* did not present the same question as this case because the change in North Carolina law only lessened the severity of the punishment prescribed for a defendant's unlawful acts; it did not make a substantive change as to what acts were lawful or unlawful. And while the "culpability and dangerousness" indicated by a defendant's lengthy prior state sentence "does not cease to exist when *a State* reformulates its criminal statutes," 563 U.S. at 823 (emphasis added), and "[i]t cannot be correct that subsequent changes in *state* law can erase an earlier conviction for ACCA purposes," *id*. (emphasis added), a defendant's culpability and dangerousness plainly change in the eyes of *federal* law when the conduct for which he was previously convicted under state law is no longer unlawful under federal law.

2. *The Evolving Classification of Substances*

Further, insofar as this case concerns the temporal focus of a court's assessment of federal law with respect to possible enhanced punishment on account of a defendant's prior conviction involving controlled substances, we think it important to begin with the recognition that in enacting the CSA, Congress launched

23

a panorama of controlled substances that it plainly envisioned would be ever-evolving, not an unchanging array engraved in stone. The CSA makes it unlawful knowingly or intentionally to, *inter alia*, "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). And the CSA, as enacted in 1970, designated the controlled substances listed in "Schedule[s]" I, II, III, IV, and V, *id*. § 812(b), as the drugs and other substances to which the prohibitions then applied. But while specifying that "[t]he term 'controlled substance' means a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V [of § 812(b)]," *id*. § 802(6), Congress added that after October 27, 1970, those schedules "*shall be updated* and republished *on an annual basis*," *id*. § 812(a) (emphases added). As a result, "the CSA schedule is a moving target," *Doe*, 886 F.3d at 210. Indeed, "since 1970"--and before 2015--"'approximately 160 substances ha[d] been added, removed, or transferred from one schedule to another.'" *Id*. (quoting *Matter of Ferreira*, 26 I. & N. Dec. 415, 418 (B.I.A. 2014)).

The updating and republication of the schedules of what drugs or other substances are controlled are carried out by the United States Attorney General or his Department of Justice designee, as permissibly authorized by the CSA, which places

specific restrictions on the Attorney General's discretion to define criminal conduct, *see generally Touby v. United States*, 500 U.S. 160, 167 (1991). The CSA also imposes on the Attorney General procedural constraints, such as required consultation with--and sometimes deference to--the Secretary of Health and Human Services ("Secretary") on scientific and medical issues, and requirements for public notice and opportunity for comment prior to the Attorney General's exercise of his CSA-conferred authority to, *inter alia*, add a drug or other substance to a particular schedule or remove a drug or other substance from the schedules, *see, e.g.*, 21 U.S.C. §§ 811, 812, 871(a); *see generally Touby*, 500 U.S. at 165-68. These updated lists are published in the Code of Federal Regulations, 21 C.F.R. § 1308, and identify elements of Title 21 crimes.

With respect to naloxegol, in 2013 the Drug Enforcement Administration ("DEA"), the Department of Justice agency to whose Administrator the Attorney General had assigned his CSA schedules functions, requested an evaluation and recommendation from the Secretary. The Secretary thereafter, after considering the eight factors set out in 21 U.S.C. § 811(c), including the substance's abuse potential, legitimate medical use, and dependence susceptibility, recommended that naloxegol and its salts be removed from the CSA schedules. The DEA, after also considering the statutory factors, along with the Secretary's recommendation, "f[ound] that naloxegol

does not possess abuse or dependence potential." Naloxegol Delisting Rule, 80 Fed. Reg. at 3468-69. Accordingly, on January 23, 2015, the DEA issued the Naloxegol Delisting Rule, revising CSA Schedule II's paragraph (b)(1) introductory text to list as controlled "(1) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate *excluding . . . naloxegol*." 21 C.F.R. § 1308.12(b)(1) (emphases added).

In arguing against Gibson's contention that the governing principle is that the district court should look to the Guidelines that "are in effect on the date the defendant is sentenced," 18 U.S.C. § 3553(a)(4)(A)(ii), and thus should also look to the CSA schedules on the sentencing date in his current federal case, the government states that

> [t]here is no precedent requiring a district court to treat the drug schedules, which are administrative documents incorporated into the *statutory* definition of a "controlled substance," as if they are somehow part of Sentencing Guidelines.

(Government's brief on appeal at 16-17 (emphasis in original).) To the extent that the government suggests that the CSA schedules are incorporated into the CSA, it is correct: As indicated above, the CSA-mandated schedules are the lists that are updated and republished in the Code of Federal Regulations every year. And while the government argues that the CSA schedules are not themselves guidelines, and

suggests that the district court in sentencing need not consider the CSA schedules, the fact is that the Guidelines themselves use those schedules, *see*, *e.g.*, Guidelines § 2D1.1 Application Note 3 ("**Classification of Controlled Substances**. . . . For the purposes of the guidelines, the classification of the controlled substance under 21 C.F.R. § 1308.13-15 is the appropriate classification."). The court's first obligation in determining an appropriate sentence is to calculate the proper Guidelines sentence. *See Gall v. United States*, 552 U.S. 38, 49 (2007). In a case involving a controlled substance, the court must thus determine whether what is at issue is a controlled substance. How odd it would be if the district court, in a criminal case referring to "controlled substances," were not at least implicitly required to consult the CSA schedules that the Guidelines use.

In *Townsend*, relied on by the district court in the present case, we held that "[t]he term 'controlled substance' in . . . § 4B1.2(b) refers exclusively to those substances in the CSA," 897 F.3d at 75. *Accord United States v. Bautista*, 989 F.3d 698, 702 (9th Cir. 2021). While the government argued that the *Townsend* opinion itself indicates that we were assessing federal law only as it stood at the time of Townsend's prior state-law conviction (*see* Government's December 2 Mem. at 5-6) and that our Court has applied such a "time-of-conviction" rule in other criminal cases decided by

summary order, we are not persuaded of that characterization of our precedent. We see some ambiguity in the latter group of cases which, in any event, under our Court rules lack precedential status. *See* 2d Cir. Local R. 32.1.1(a). In *Townsend* itself, there was no express statement as to what version of the CSA schedules was being consulted, but the language used does not support the government's interpretation of a purely retrospective focus. The government asserts that *Townsend* consulted the "corresponding" CSA schedules "'*at the time of*' the state conviction" (Government's brief on appeal at 14 (citing *Townsend*, 897 F.3d at 74 (emphasis in brief))); but in the sentence the government quotes, *Townsend* described only the New York law; and in the next sentence *Townsend* referred to the CSA schedules and used the present tense. *See* 897 F.3d at 74 ("*At the time of Townsend's conviction, the New York state drug schedule*, section 3306 of the New York Public Health Law, *included* HCG as a Schedule III controlled substance. *See* N.Y. Pub. Health Law § 3306, Schedule III[](g) (listing Chorionic gonadotropin). HCG *is* not a controlled substance *under the CSA*." (emphases added)). In any event, we doubt that *Townsend* was faced with a significant choice of versions, as we have found no reference to HCG in any CSA schedule.

In pursuing its timing argument that the district court, in determining the Guidelines-recommended sentence for Gibson's current federal crimes, was required to look only at the version of the CSA schedules in effect at the time of Gibson's 2002 supposed-predicate crime, the government also argues that

> whether a substance involved in an offense is "controlled" can only be answered by examining the drug schedules in effect at the time it is committed; *if the substance is not "controlled" at the time of the offense, then no crime has been committed*.

(Government's brief on appeal at 17 (emphasis added).)

But in 2002, Gibson was not prosecuted for or convicted of violating a federal law as to controlled substances; the 2002 version of the CSA schedules did not govern, and had no relevance to, his state-law crime. There was no suggestion of any relevance of the CSA to Gibson until he was to be sentenced in 2020 for his present federal bank robbery offenses, when the government requested that he be sentenced to 151-188 months' imprisonment because of his 2002 controlled substance conviction under state law.

The career-offender enhancement advocated by the government is theoretically not intended to punish Gibson for the crime he committed in 2002, *see generally Gryger v. Burke*, 334 U.S. 728, 732 (1948); but that would be its effect here, because the conduct in which Gibson engaged in 2002 and for which he was

29

thereafter duly punished--which, under the categorical approach, must be presumed to have been an attempt to sell naloxegol--is no longer a federal crime. For the federal offenses that Gibson committed in 2017 and 2018, the district court concluded that an appropriate prison term is 60 months. Thus, if the 188-month maximum prison term urged by the government were imposed on Gibson, he would serve not just the five years warranted for his present federal crimes, but an additional 10-plus years' imprisonment on account of the state-law-prohibited conduct for which he has already been punished by the state and which is no longer federally prohibited. We conclude that the district court properly rejected the government's contention that the relevant CSA schedules were those in effect in 2002.

That said, we note that it is not clear that in determining whether the state law applicable to the defendant's prior controlled substance conviction is broader than federal law, the version of the CSA schedules on which the district court should focus is the version in effect on the date of the defendant's sentencing for his current offense rather than on the date on which he committed his current offense. A defendant's sentencing date is somewhat unpredictable, postponable for example to accommodate health problems, or to allow collection of additional information for sentencing, or to facilitate a defendant's cooperation with the government in other

prosecutions.  As the *McNeill* Court observed, multiple defendants may well have different sentencing dates despite having committed their crimes on the same date. *See* 563 U.S. at 823.

The government points to that observation and argues that "focusing on the drug schedules from the date of [the prior] conviction 'permits a defendant to know even *before* he violates' federal law whether his offense *is* categorically *broader than a federal counterpart*." (Government's reply brief on appeal at 5 (quoting *McNeill*, 563 U.S. at 823 (first emphasis in reply brief; second and third emphases ours)).) Indeed, a defendant who is perhaps about to "violate[] federal law" and wants "to know . . . before he [acts]" whether his state-law conviction "is . . . broader than a federal counterpart" would have to know the contemporaneous content of that federal counterpart, *i.e.*, the law at the time of his federal offense.  This is the point in time at which he could choose to refrain from conduct whose consequences would depend on federal criminal law.  But, as discussed above, by law the CSA schedules are updated every year.  And even a potential federal offender who might consult the contemporaneous CSA schedules to determine what substances are controlled would likely not be alerted to a need to ferret out decades-old superseded versions of the

federal controlled substance schedules that in fact were not applied to his decades-old conduct.

Here, by the time Gibson began his 2017 bank robbery spree, the CSA schedules, having eliminated naloxegol in 2015, were narrower than the New York schedules applicable to his 2002 state-law conviction. We have seen no reason to believe that Congress, which required that federal "drug schedules"--which are "incorporated into the *statutory* definition of a 'controlled substance'" (Government brief on appeal at 16-17 (emphasis in original))--be updated with appropriate additions, reclassifications, and deletions every year, would have intended that such changes in the federal substantive criminal law should be ignored in connection with controlled-substance-related principles of enhanced sentencing for a contemporaneous offense.

Nonetheless, we need not decide in this case whether, in determining the applicability of Guidelines § 4B1.1, the district court should consult the CSA version at the time of the defendant's current offense or the version at the time of his sentencing for this offense, since the controlled substance schedules were narrower than state law at both times. Naloxegol was not a controlled substance in the CSA

32

schedules either when Gibson committed his robberies or when he was sentenced for them.

3. *The Government's Reliance on* Doe

The government also relies on our decision in *Doe*, 886 F.3d 203, an immigration case. The petitioner in that case sought review of a decision by the Board of Immigration Appeals affirming an order of removal that was based on his 2014 federal conviction of an aggravated felony, *see* 8 U.S.C. §§ 1227(a)(2)(A)(iii), (B)(i); *id.* §§ 1101(a)(43)(B), (U), following his plea of guilty to "conspiracy to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. §§ 846, 841(b)(1)(C) of the CSA," *Doe*, 886 F.3d at 206. Doe contended that because the DEA removed "naloxegol . . . from the CSA Schedules" in January 2015, during the pendency of his removal proceedings, "his conviction no longer categorically involved a controlled substance, as required for his removal." *Doe*, 886 F.3d at 206. We denied the petition, noting that "the legal question of what a conviction *necessarily* established" depends on "the CSA Schedules in effect at the time of conviction," not, "as a rule," on the fortuitous modification of the CSA schedules after he had been convicted. *Id.* at 209-10 (emphasis in original) (internal quotation marks omitted); *see*

33

*also id*. at 210 (noting the intent of the "saving statute," 1 U.S.C. § 109, "to ensure that a convicted criminal defendant does not fortuitously benefit from more lenient laws that may be passed after he or she has been convicted" (internal quotation marks omitted)).

The government here, referring to Doe's conviction as "his *earlier* conviction," argues that "when determining whether *a prior conviction* constituted a 'controlled substance offense,' district courts should evaluate the statute as written at the time of that conviction" (Government's brief on appeal at 11 (emphases added)); and it insists that *Doe*, although an immigration case, involved "the same reasoning" that the government advocates here (*id*. at 8), and that *Doe* is thus an "on-point precedent" (*id*. at 12) involving "the same analysis" (*id*. at 12-13). We disagree, given that the contexts of *Doe* and the present case are legally and factually different. Legally, an alien removal proceeding is not a criminal prosecution. *See, e.g., INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984) (deportation is not punishment); *Doe*, 886 F.3d at 210 ("retroactive deportation does not violate the *Ex Post Facto* Clause" (internal quotation marks omitted)).

Nor did the factual circumstances in *Doe* parallel those here--contrary to the government's references to Doe as having an "*earlier* conviction," "*a prior*

34

*conviction*," a "*state* conviction" (Government's brief on appeal at 11-12 (emphases added)). We see no indication--either in the pages of *Doe* cited by the government or in the *Doe* record as a whole--that the petitioner in *Doe* had more than one criminal conviction. And that conviction--a judgment sentencing him for a federal violation that was an aggravated felony--was necessarily earlier than and prior to the challenged removal proceeding, given that the proceeding was based on that conviction. *Doe* simply involved the question of whether that conviction was one for an aggravated felony. That question could only be answered by looking at the law that was actually applied.

In short, *Doe* did not involve more than one set of convictions, did not require comparison of the laws of two sovereigns, and did not concern punishment. The government's reliance on *Doe* is misplaced.

CONCLUSION

We have considered all of the government's arguments on this appeal and have found in them no basis for reversal. The Guidelines § 4B1.1 career-offender enhancement, here premised in part on a 2002 conviction under New York State Penal

Law §§ 220.39(1) and 110, was inapplicable to Gibson for lack of a necessary predicate. Gibson was sentenced in 2020 for bank robbery offenses committed in 2017. The CSA had removed naloxegol as a federally controlled substance in 2015, thereby making federal law categorically narrower than the state-law counterpart.

The judgment is affirmed.